## Commonwealth vs. Duncan Purdy.

Middlesex. December 6, 2010. - April 15, 2011.

Present: Spina, Cowin, Cordy, Botsford, & Gants, JJ.[1]

*Prostitution. Deriving Support from Prostitution. Evidence,* Authentication, Hearsay, Verbal conduct. *Practice, Criminal,* Instructions to jury.

At a criminal trial, the judge did not err in admitting in evidence electronic mail (e-mail) exchanges, where the Commonwealth demonstrated adequate confirming circumstances to authenticate the e-mails as having been authored by the defendant, namely, evidence that the e-mails originated from an account bearing the defendant's name and acknowledged to be used by the defendant; evidence that the e-mails were found on the hard drive of a computer that the defendant acknowledged he owned, and to which he supplied all necessary passwords; and other evidence of the defendant's authorship, including one e-mail that contained an attached photograph of the defendant and another e-mail in which the defendant described himself. [447-451]

At the trial of indictments charging deriving support from the earnings of a prostitute, in violation of G. L. c. 272, § 7, and maintaining a house of prostitution, in violation of G. L. c. 272, § 6, the judge erred in failing to provide the jury with an instruction limiting their use of out-of-court hearsay statements made by an alleged prostitute who solicited an undercover officer visiting the defendant's establishment, where some of the statements could have been understood by the jury to have been offered for the truth of the matter asserted; however, where this court could conclude with fair assurance, based on the abundant evidence that the defendant was aware of the sexual nature of the services provided by masseuses at his salon, that the error did not influence the jury, or had but very slight effect, the error was not prejudicial. [451-455]

At the trial of indictments charging, inter alia, maintaining a house of prostitution, in violation of G. L. c. 272, § 6, the judge's erroneous definition of "sexual intercourse" in her final instructions on the elements of the crime, which permitted the jury to find "sexual intercourse" based on acts other than those encompassed by the statute, created a substantial risk of a miscarriage of justice, where there was no evidence that the masseuses at the defendant's salon were present for the purpose of "sexual intercourse," as defined in the statute, or that the defendant knew about such activity; therefore, this court vacated the defendant's conviction on that indictment, set aside the jury verdict, and ordered judgment to be entered for the defendant. [455-457]

[1] Justice Cowin participated in the deliberation on this case prior to her retirement.

INDICTMENTS found and returned in the Superior Court Department on December 1, 2005.

The cases were tried before *Geraldine S. Hines*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Sejal H. Patel* for the defendant.

*KerryAnne Kilcoyne*, Assistant District Attorney, for the Commonwealth.

GANTS, J. The defendant was convicted of deriving support from the earnings of a prostitute, in violation of G. L. c. 272, § 7, and maintaining a house of prostitution, in violation of G. L. c. 272, § 6.[2] The Appeals Court affirmed in an unpublished memorandum and order pursuant to its rule 1:28, *Commonwealth* v. *Purdy*, 76 Mass. App. Ct. 1119 (2010), and we granted the defendant's application for further appellate review. On appeal, the defendant challenges the admission of ten electronic mail (e-mail) exchanges that he claims were not properly authenticated. He also argues that the trial judge erred in failing to provide the jury with an instruction limiting their use of statements made by an alleged prostitute to an undercover officer who visited the defendant's establishment. After oral argument, we requested supplemental briefing regarding whether the judge's definition of "sexual intercourse" in her final instructions on the elements of the crime of maintaining a house of prostitution created a substantial risk of a miscarriage of justice, and whether the evidence was legally sufficient to support a conviction of that offense.

We conclude that the judge's instruction regarding "sexual intercourse" was error that created a substantial risk of a miscarriage of justice as to the indictment charging maintaining a house of prostitution, and that the evidence at trial was insufficient as a matter of law to support a finding of guilt as to that indictment. We therefore vacate the defendant's conviction on that indictment, set aside the jury verdict, and order judgment to be entered for the defendant. However, we affirm the defendant's conviction of deriving support from the earnings of a

---

[2]The defendant received concurrent sentences of from two years to two years and one day in State prison.

prostitute because we conclude that the e-mail exchanges were properly authenticated and admitted in evidence, and that, while the judge erred in not providing an instruction limiting the jury's use of a masseuse's out-of-court statements, the error was not prejudicial because we find with "fair assurance" that it "did not influence the jury, or had but very slight effect." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983).

*Background.* We summarize the evidence at trial, viewed in the light most favorable to the Commonwealth, reserving certain details for our discussion of the legal issues. The defendant owned and operated the About Hair Salon (salon) in Harvard Square in Cambridge, which was simultaneously a hair salon, antique store, art studio, and massage parlor. The gist of the Commonwealth's case was that the massage business the defendant ran provided sexual services as "extras" to the massages.

Two undercover detectives entered the salon and received massages. The first, Detective Louis Cherubino of the Cambridge police department, entered on September 22, 2005, and told the defendant he was looking for a massage but was "in a hurry." The defendant suggested the fifteen-minute massage for sixty dollars, and asked if he was interested in any "extras," such as "topless" for an additional twenty-five dollars or "totally nude" for an additional fifty dollars. Detective Cherubino paid the defendant sixty dollars in cash, using marked bills, and was introduced to a masseuse, whom the defendant called Lydia.

The detective entered a small room that was separated from the rest of the salon only by a "stand-up bifold door," and Lydia told him to undress and lie down on the massage table. When she confirmed that he was only getting a fifteen-minute massage, without "extras," the detective asked what the extras were. She discussed the available extras, including "pop the cork," which she explained was anal intercourse. She told the detective that if he wanted any extras, he should speak to the defendant.

After the massage, Lydia gave the detective a "massage menu" that listed various services and prices, including "pop the cork" for fifty dollars and a "Russian ending" for twenty-five dollars. In explaining the "Russian ending," Lydia exposed one of her breasts and said she would offer the service, which

caused the detective to understand that, in a "Russian ending," the customer puts his penis between the masseuse's breasts until he ejaculates. Before leaving the salon, the detective asked the defendant whether there would be other females available for services. The defendant said that he had "just let a few go" but was in the process of interviewing and should have some available by the following week.

The second undercover detective to enter the defendant's business was Detective James Hyde of the Somerville police department, who visited the salon on October 4, 2005, having previously arranged for a 7 P.M. massage appointment. When he arrived, the defendant informed him that the masseuse was still with the previous customer, and asked him to wait. During the one-half hour wait, the detective overheard the defendant telling someone on the telephone that a "Russian ending" was "a satisfactory ending to the session between a woman's breasts." The defendant handed the detective a menu listing massage services and prices, and the detective ordered a fifteen-minute massage for sixty dollars with the masseuse being "topless" for an additional twenty-five dollars. The defendant gave him a five dollar discount because he had waited so long, and the detective paid the defendant the eighty dollars in cash, using marked bills. He then entered the massage room and received a massage from a topless masseuse.

The police executed a search warrant of the salon on October 7, 2005, and during the course of that search seized a desktop computer. After the defendant received Miranda warnings and waived his rights, he told Detective Joseph Murphy of the Cambridge police department, in response to his questions, that the desktop computer was his and that he used it. He also provided, from his own memory, the passwords needed to access programs on the computer. The defendant was searched and found to have $1,608 in cash, including three of the marked bills that had been paid by Detective Hyde.

Detective Murphy made an exact copy of the hard drive of the defendant's computer and, in searching it, located numerous e-mails, of which ten e-mail exchanges were admitted in evidence. These e-mails were sent from an e-mail account that the defendant acknowledged during his testimony that he used, with

an e-mail address that contained the defendant's first and last names. Detective Murphy also located 69,000 images on the computer, some of which were photographs that were shown to the jury, and thousands of which were photographs that were taken with a digital camera found in the salon.

Among the e-mail exchanges admitted in evidence was one that was initiated from the defendant's e-mail address and signed with the defendant's name and the address of the salon, and had the "header," "personal assistant with benefits?." The author wrote that he was "seeking a personal secretary with an open mind, who . . . knows where to keep her nose and where not." In response to a reply from a recipient, the author described himself as a "working artist, as well [as an] entrepreneur, small business guy, hairstylist, art and antiques dealer, [and] massage therapist," and added, "and I operate a service."[3] In a later e-mail in this exchange, also from the defendant's e-mail address, the author asserted that potential earnings could range from $200 to $2,000 per week.

A separate e-mail was entitled "massage" and was sent from the defendant's e-mail address and signed with the defendant's first name. The author describes a "blond girl" who is "fairly new and so a little nervous," and states: "If you are gentle and kind to her I'm sure you're going to have a very good time." He adds, "She has beautiful breasts and she will allow light touching. It is ok, but no other touching." The recipient of the e-mail responded that he wanted an "unhurried session" with a "gal who will treat me right[,] be slow[,] gentle and very friendly within her limits."[4] An e-mail from the defendant's e-mail address and signed with the defendant's first initial replied, "I will make sure you are treated well."

The defendant testified that he operated his massage business by renting space to masseuses, charging fifty dollars for a four-hour rental period; he denied hiring any masseuses. He claimed

[3]The e-mails admitted in evidence contain, below the contents of the primary e-mail, the text of a series of prior e-mails producing a back and forth exchange.

[4]The defendant has not pressed an objection, on hearsay or other grounds, to the admission of statements contained in e-mails sent to the defendant's address from other addresses, other than his claim, discussed below, that the evidence that he was the person receiving and responding to the communications was insufficient to authenticate them.

to be unaware of any sexual services performed on the premises in exchange for a fee and testified that he was clear with the masseuses that there was to be no sexual activity or lewdness. The defendant also denied offering Detective Cherubino any "extras" or authoring the e-mails in evidence.

The computer was located in the area of the salon that was devoted to the sale of antiques, near the massage room, and the defendant testified that it was always on and that other people in the salon, particularly the masseuses, knew the passwords to his computer and used the computer frequently. He testified that they used his e-mail account to play pranks on him, and that they answered e-mails in his name. Asked about each e-mail individually, the defendant asserted that most of the e-mails in evidence were pranks and he was unsure what the others were.

*Discussion.* 1. *Authentication of e-mail messages.* The defendant argues that the judge erred in admitting the ten e-mail exchanges because the evidence was insufficient to authenticate them as having been authored by him. "The requirement of authentication . . . as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Mass. G. Evid. § 901(a) (2011). See *Commonwealth* v. *Nardi*, 452 Mass. 379, 396 (2008); *Commonwealth* v. *LaCorte*, 373 Mass. 700, 704 (1977); M.S. Brodin & M. Avery, Massachusetts Evidence § 9.2, at 580 (8th ed. 2007). See also Fed. R. Evid. § 901(a) (2010) (same). "The role of the trial judge in jury cases is to determine whether there is evidence sufficient, if believed, to convince the jury by a preponderance of the evidence that the item in question is what the proponent claims it to be. If so, the evidence should be admitted, if it is otherwise admissible." M.S. Brodin & M. Avery, Massachusetts Evidence, *supra.* See *Commonwealth* v. *Nardi*, *supra.* Here, because the relevance and admissibility of the communications depended on their being authored by the defendant, the judge was required to determine whether the evidence was sufficient for a reasonable jury to find by a preponderance of the evidence that the defendant authored the e-mails. See *Commonwealth* v. *Leonard*, 428 Mass. 782, 785-786 (1999); Mass. G. Evid. § 104(b)(1) & note, at 11.[5] Evidence

---

[5]Evidence of authorship would not necessarily have been a precondition of

may be authenticated by direct or circumstantial evidence, including its "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics." Mass. G. Evid. § 901(b)(1), (4). Fed. R. Evid. § 901(b)(1), (4). See *Commonwealth* v. *Nardi*, *supra*.

Here, the defense moved in limine to preclude the Commonwealth from introducing the e-mails in evidence. Defense counsel represented that the defendant shared his computer with others at the salon and that he denied authoring the e-mails, but did not challenge the prosecutor's representation that the e-mails she sought to offer were taken from the hard drive of the computer owned by the defendant and were signed with the defendant's first name or his first initial. The judge denied the motion in limine based on the prosecutor's unrebutted representation. At the time the e-mails were offered and admitted in evidence, the Commonwealth not only had provided evidence to support its representations but also had elicited evidence from Detective Murphy that the defendant knew and provided from memory all the passwords necessary to access the computer's programs, and that the e-mails originated from an e-mail address that the defendant used and that bore his name.[6] The Commonwealth, however, did not furnish direct evidence that the defendant had authored any of the ten e-mails admitted in evidence; there was no testimony that anyone observed him typing any of the e-mails or that anyone had discussed any of the e-mails with him. The defendant contends this evidence is insufficient to establish that the e-mails were what the Commonwealth claimed them to be, that is, e-mails authored by the defendant. We disagree, and we conclude that the evidence was sufficient to authenticate the e-mails as having been authored by the defendant.

A judge making a determination concerning the authenticity

---

admissibility if the prosecution had offered the e-mails, which the defendant acknowledged having read, as evidence of the defendant's knowledge of the nature of the massage business in the salon. See *Commonwealth* v. *Monahan*, 349 Mass. 139, 168 (1965). If offered for this purpose, the prosecution would not need to show authorship of the e-mails, but would need only to authenticate the communications as accurate reproductions of the messages that were received and sent from the defendant's computer and e-mail address.

[6]The Commonwealth also provided evidence through the testimony of Detective Murphy that the printed e-mails offered in evidence were accurate reproductions of the original electronic evidence extracted from the defendant's computer.

of a communication sought to be introduced in evidence may look to "confirming circumstances" that would allow a reasonable jury to conclude that this evidence is what its proponent claims it to be. See *Commonwealth* v. *Hartford*, 346 Mass. 482, 488 (1963). In the context of telephone conversations, where a witness has received a telephone call and cannot identify the caller's voice, evidence that the caller identified himself as the defendant is not sufficient to authenticate the conversation. See *id.* ("the mere fact that the speaker said he was the defendant was not enough to render the conversation admissible"). See also *Bond Pharmacy, Inc.* v. *Cambridge*, 338 Mass. 488, 491 (1959) ("The fact that the person initiating the call says he is A is not enough to make the conversation admissible"); *Commonwealth* v. *Harris*, 232 Mass. 588, 591 (1919). But other "confirming circumstances" may provide sufficient evidence that the defendant was the caller. See *Commonwealth* v. *Hartford, supra.* Thus, a witness who lived in the same home as the victim was allowed to testify about the statements made by a caller who claimed to be the defendant, where she had previously answered other telephone calls from a person who identified himself as the defendant, the behavior of the victim and defendant on these previous occasions corroborated the identity of the caller, telephone records showed that a call had been placed from the defendant's telephone number to the victim's residence around the time of the call in question, and the defendant said he had telephoned the victim's residence that day. *Id.* at 487-488. Similarly, where a witness placed a telephone call to a "land-line" telephone number located in an apartment in which the defendant was the only male resident, where the male answering the telephone had the same voice as the male who had answered previous telephone calls to that telephone number, and where the male provided information during the telephone call that confirmed his identity as the defendant, the telephone call was sufficiently authenticated and properly admitted in evidence. See *Commonwealth* v. *Anderson*, 404 Mass. 767, 770 (1989).

In the context of written letters, where a witness has received a letter and cannot identify the writer's handwriting or signature, evidence that the writer identified himself as a particular individual is not sufficient to authenticate the letter. See *Irving*

v. *Goodimate Co.,* 320 Mass. 454, 459 (1946); *Commonwealth* v. *Harris, supra; Nunes* v. *Perry,* 113 Mass. 274, 275-277 (1873). But where a witness identified the handwriting in a letter as that of the defendant, see *Pataskas* v. *Judeikis,* 327 Mass. 258, 260 (1951), or where the letter was received as a reply to a letter sent by the witness to a particular addressee, see M.S. Brodin & M. Avery, Massachusetts Evidence, *supra* at § 9.3.2 (b), at 583-584 & n.8, citing *Connecticut* v. *Bradish,* 14 Mass. 296, 300 (1817); 7 J. Wigmore, Evidence § 2153, at 753 (Chadbourn rev. ed. 1978) (reply letter rule "universally accepted"), or where other confirming circumstances are present, see *Irving* v. *Goodimate Co., supra,* a letter can be authenticated and properly admitted in evidence.

While e-mails and other forms of electronic communication present their own opportunities for false claims of authorship, the basic principles of authentication are the same. See *United States* v. *Safavian,* 435 F. Supp. 2d 36, 41 (D.D.C. 2006) ("The *possibility* of alteration does not and cannot be the basis for excluding e-mails as unidentified or unauthenticated as a matter of course, any more than it can be the rationale for excluding paper documents" [emphasis in original]); *Simon* v. *State,* 279 Ga. App. 844, 847 (2006) ("e-mail offers unique opportunities for fabrication [but] it is held to the same standards of authentication as other similar evidence"). Evidence that the defendant's name is written as the author of an e-mail or that the electronic communication originates from an e-mail or a social networking Web site such as Facebook or MySpace that bears the defendant's name is not sufficient alone to authenticate the electronic communication as having been authored or sent by the defendant. See *Commonwealth* v. *Williams,* 456 Mass. 857, 868-869 (2010). There must be some "confirming circumstances" sufficient for a reasonable jury to find by a preponderance of the evidence that the defendant authored the e-mails. See *Commonwealth* v. *Hartford, supra* at 488. See also *Commonwealth* v. *Williams, supra.*

Here there were adequate "confirming circumstances" to meet this threshold: in addition to the e-mails having originated from an account bearing the defendant's name and acknowledged to be used by the defendant, the e-mails were found on the hard

drive of the computer that the defendant acknowledged he owned, and to which he supplied all necessary passwords. While this was sufficient to authenticate the e-mails in the absence of persuasive evidence of fraud, tampering, or "hacking," there was additional evidence of the defendant's authorship of most of the e-mails. At least one e-mail contained an attached photograph of the defendant, and in another, the author described the unusual set of services provided by the salon when he characterized himself, among other things, as a "hairstylist, art and antiques dealer, [and] massage therapist."[7] The defendant's uncorroborated testimony that others used his computer regularly and that he did not author the e-mails was relevant to the weight, not the admissibility, of these messages. See *Commonwealth* v. *Mahoney*, 400 Mass. 524, 529-530 (1987); *Chartrand* v. *Registrar of Motor Vehicles*, 345 Mass. 321, 325 (1963), *S.C.*, 347 Mass. 470 (1964). The judge did not err in concluding that the e-mails were authenticated as having been authored by the defendant.

2. *Out-of-court statements to the undercover detective.* The defendant argues that the judge improperly denied his request for a limiting instruction regarding the statements made by

[7]The confirming circumstances in this case are stronger than those in *Commonwealth* v. *Williams*, 456 Mass. 857, 868-869 (2010), where we concluded that messages sent from the MySpace Web page of the defendant's brother were not properly authenticated as having been authored by the defendant's brother. In that case, we noted that there was no testimony regarding how secure a MySpace Web page is, who can access it, or whether codes are needed for such access. *Id.* at 869. Moreover, "while the foundational testimony established that the messages were sent by someone with access to [the defendant's brother's] MySpace Web page," the author of the messages did not identify himself with the name of the defendant's brother (or any other name). *Id.* Unlike in *Commonwealth* v. *Williams*, *supra*, where the messages could have been sent from any computer or device with access to the Internet and there was no evidence of how authorship might have been limited, the e-mails in this case were found on a computer belonging to the defendant and for which passwords were required.

While we noted in *Commonwealth* v. *Williams*, *supra* at 869, that the Commonwealth did not offer expert testimony that the defendant's brother was the only person who could communicate from that Web page, we do not suggest that expert testimony or exclusive access is necessary to authenticate the authorship of an e-mail. Nor do we suggest that password protection is necessary to authenticate the authorship of an e-mail, even though there was such protection here.

Lydia to undercover Detective Cherubino when he visited the salon. Before trial, the Commonwealth filed a motion in limine to admit these statements. The judge allowed the motion but agreed to consider a limiting instruction that defense counsel offered to draft. At trial, the detective testified to various statements made to him by Lydia while he was in the massage room, which we have earlier summarized; Lydia did not testify at trial. The defendant did not object at that time to the testimony of Detective Cherubino. At the charge conference after the close of evidence, the defendant requested an instruction limiting the use of Lydia's out-of-court statements, but the judge denied this request, ruling that the statements were admissible as nonhearsay.

An out-of-court statement is hearsay where it is offered in evidence to prove the truth of the matter asserted. Mass. G. Evid. § 801(c), at 230 (2011). "[W]hen out-of-court statements are offered for a reason other than to prove the truth of the matter asserted or when they have independent legal significance, they are not hearsay." *Id.* at 233. See *Commonwealth* v. *Montanez*, 439 Mass. 441, 447-448 (2003). Statements that comprise a solicitation of a sexual act, including any negotiations regarding the price or services, are "verbal acts" that have legal significance either by themselves or together with the nonverbal conduct that they accompany and explain. See *Commonwealth* v. *Mullane*, 445 Mass. 702, 710-711 (2006), quoting *Commonwealth* v. *Kimball*, 7 Gray 328, 330 (1856) (statements of prostitute negotiating fee for sexual services are admissible as evidence of "character of the house"). Where a defendant is charged, as here, with maintaining a house of prostitution and deriving support from the earnings of a prostitute, the solicitation of sex inside the premises, regardless of the truth of the words used in the solicitation, is an act that may establish an element of each offense — respectively, that a masseuse was on the premises for the purpose of unlawfully having sexual intercourse, and that a masseuse was engaged in prostitution. See *Commonwealth* v. *Mullane*, *supra* at 714; G. L. c. 272, § 7. There is no special rule of hearsay limited to the prosecution of prostitution; the line of cases that make such statements admissible to prove the "character of the house" is merely an application of the doctrine that verbal acts and "operative words" are admissible because they are, for example, the words used to

effectuate the commission of a crime, or to make a contractual promise or describe its terms, or to form a criminal conspiracy or set forth its aims. See *Commonwealth* v. *McLaughlin*, 431 Mass. 241, 246 (2000) (evidence of terms of oral agreement not offered for truth of matters asserted, but as proof of existence of conspiracy); *Commonwealth* v. *Jensky*, 318 Mass. 350, 351- 352 (1945) (in prosecution for being found in room with "apparatus" for registering bets, officer's testimony that he answered twelve telephone calls from individuals who asked to place bets on certain horses was admissible); *Shimer* v. *Foley, Hoag & Eliot LLP*, 59 Mass. App. Ct. 302, 308 & n.13 (2003) (words of offer and acceptance admissible in contract action).

A sexual solicitation or related negotiation that is admitted as a verbal act evidencing the "character of the house" is admitted only for that limited purpose and not for the truth of the matter asserted, if any. See generally *Salvi* v. *Suffolk County Sheriff's Dep't*, 67 Mass. App. Ct. 596, 603-604 (2006). Where a statement is inadmissible for one purpose, and admissible for another purpose, a party is entitled to ask for and obtain a limiting instruction. See *Commonwealth* v. *Magraw*, 426 Mass. 589, 594-595 (1998); *Commonwealth* v. *Costa*, 354 Mass. 757, 757 (1968). See also Mass. G. Evid. § 105. Here, to the extent some of the statements made by Lydia during her solicitation could have been understood by the jury to have been offered for the truth of the matter asserted, the defendant was entitled to an instruction limiting the jury's use of these statements on request.[8] The judge erred in denying the defendant's request for a limiting instruction.[9]

The failure to provide a limiting instruction, however, was

___

[8]In denying a limiting instruction, the judge relied on our assertion in *Commonwealth* v. *Mullane*, 445 Mass. 702, 711 (2006), that the prostitute's negotiation of a fee for "extras" was "nonhearsay"; we did not clarify that the statements were nonhearsay only when not submitted for the truth of the matters asserted, perhaps because nothing was said during those negotiations that could have been used for its truth.

[9]The judge, however, did not err in refusing to give the defendant's proposed limiting instruction, which declared:

"You have heard during the course of the trial extra-judicial statements made by police officers, that is, statements which may or may not indicate the character of the house in question. These statements are not being offered for the truth of the matters asserted, and you should not

not prejudicial error as to the conviction of deriving support from the earnings of a prostitute because, viewing Lydia's statements in the context of the totality of the evidence, we conclude that "the error did not influence the jury, or had but very slight effect." *Commonwealth* v. *Christian*, 430 Mass. 552, 563 (2000), quoting *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).[10] The most important of Lydia's statements admitted in evidence and argued in closing for the truth of the matter asserted was that, if the customer would like any "extras," he was to speak with the defendant. This statement was part of Lydia's solicitation of "extras" from the undercover detective and therefore was a verbal act admissible for the limited purpose of showing the "character of the house." But it was not admissible (unless through another hearsay exclusion or exception) to show that, in fact, the defendant was responsible for approving "extras." While we acknowledge that the prosecutor argued in closing that Lydia's statement that the defendant was in charge of "extras" was "important," we conclude, in light of the abundant other evidence that the defendant knew that the masseuses were providing sexual "extras," that the jury were not materially affected by the absence of a limiting instruction in finding the

judge these statements any differently than any other statements you have heard from any of the witnesses who have testified in this trial."

This instruction was both confusing and incorrect. It was confusing because, by referring to "extra-judicial statements made by police officers," it did not make clear that it meant to limit the use of the statements made by the masseuse. And while it stated that the evidence was "not being offered for the truth," it was incorrect in stating that jurors "should not judge these statements any differently than any other statements you have heard from any of the witnesses who have testified," where the purpose of the limiting instruction was to inform jurors to treat these statements differently from those of in-court witnesses, which they may consider for the truth of the matters asserted. The judge should have amended the defendant's proposed limiting instruction or crafted her own.

[10]A conviction of deriving support from the earnings of a prostitute requires the jury to find that a particular individual was a prostitute, that the defendant knew that the individual was a prostitute, and that the defendant shared in some way in the earnings or proceeds of this person's prostitution. See G. L. c. 272, § 7. Unlike a conviction of maintaining a house of prostitution in violation of G. L. c. 272, § 6, discussed *infra*, a conviction of this charge does not require a finding that any individual had the purpose of engaging in sexual intercourse for a fee, but rests on a "common understanding of the meaning of prostitution." See *Commonwealth* v. *Walter*, 388 Mass. 460, 464 (1983).

defendant guilty of deriving support from the earnings of a prostitute. The menu itself, which the defendant personally handed to undercover Detective Hyde, includes "Russian ending" and "pop the cork" as "side orders" to the various "sensual massage" and "fantasy session" offerings. In addition, the defendant's continual presence in the salon; the evidence of his control over the pricing, scheduling, and ordering of services, and over the collection of money; his characterization of a "Russian ending" as "a satisfactory ending to the session between a woman's breasts"; and the e-mails discussing sexual services that originated from his e-mail address — dismissed by him as "pranks" — provide abundant evidence that the defendant was aware of the sexual nature of the services provided by masseuses at the salon.

3. *Jury instructions and sufficiency of the evidence as to the indictment charging maintaining a house of prostitution.* To obtain a conviction of maintaining a house of prostitution in violation of G. L. c. 272, § 6, the Commonwealth must prove beyond a reasonable doubt that (1) the defendant owned, managed, or assisted in the management or control of certain premises; (2) a person was present on those premises for the purpose of unlawfully having sexual intercourse; (3) the defendant induced or knowingly suffered the person's presence on the premises for that purpose; and (4) the purpose of the sexual intercourse was for financial gain. *Commonwealth* v. *Mullane,* 445 Mass. 702, 714 (2006). "The term 'sexual intercourse,' as used in G. L. c. 272, § 6, encompasses only penile-vaginal penetration." *Id.* at 717. See *Commonwealth* v. *Smith,* 431 Mass. 417, 419-420 (2000).

In her final instructions to the jury, the judge correctly listed the elements necessary for a conviction, but then stated:

> "The law defines sexual intercourse as the insertion to any degree of the male penis into the genital opening of the female. . . . Unnatural sexual intercourse includes oral and anal intercourse, including fellatio and cunnilingus, and any other intrusion of any other object into the genital or anal opening of another person's body."

This instruction was erroneous in that it permitted the jury to

find "sexual intercourse" based on any intrusion into the genital or anal opening, including oral and anal intercourse.[11] Because the defendant did not object at trial, we must determine whether the error created a "substantial risk of a miscarriage of justice." *Commonwealth* v. *Alphas*, 430 Mass. 8, 13 (1999). See *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). In applying this test, we consider the strength of the Commonwealth's case and vacate a conviction if the judge's error materially influenced the verdict. See *Commonwealth* v. *Alphas, supra* at 13, quoting *Commonwealth* v. *Freeman, supra* at 564. We conclude that the error materially influenced the verdict in this case.

The Commonwealth asks us to infer that, because the masseuses offered other specific sexual services, they were available for sexual intercourse as defined in *Commonwealth* v. *Mullane, supra*. This inference is untenable. There was no evidence that the masseuses were present in the defendant's establishment for the purpose of penile-vaginal intercourse, or that the defendant knew about such activity. To the contrary, the evidence

---

[11]The Commonwealth argues in its supplemental brief that the judge did not instruct the jury that "unnatural sexual intercourse" was included within the definition of "sexual intercourse," but merely defined the term to distinguish it from "sexual intercourse," which includes only penile-vaginal penetration. However, during the charge conference, the prosecutor (who is not the appellate attorney) specifically expressed concern that the jurors might understand the term "sexual intercourse" under G. L. c. 272, § 6, to mean only penile-vaginal intercourse, noted that there was evidence of anal intercourse, and stated: "I would just like the court to offer the instruction that sexual intercourse can be defined as natural or unnatural and here's what that is. . . . I just don't want them to think that it needs to be what I think [lay persons] think it is." The judge responded, "That's a fair point," and the instructions ultimately given incorporated the Commonwealth's request. In addition, the prosecutor in closing argument declared: "The judge is going to instruct you on the law . . . [a]nd she's going to talk to you about what the legal definition of sexual intercourse is. It's not only sexual intercourse, vaginal intercourse as you may think it to be, but it's also a lot of other things, including what the law calls unnatural sexual intercourse, which one of those definitions is anal sex." In short, the record is clear that the Commonwealth requested and the judge gave the instruction precisely because they erroneously understood that "sexual intercourse" included various forms of sexual conduct, and they clearly communicated this misunderstanding to the jury. The Commonwealth's argument on this issue in its supplemental brief is not merely wrong; it should never have been made. See *Berger* v. *United States*, 295 U.S. 78, 88 (1935) (interest of prosecution "is not that it shall win a case, but that justice shall be done").

indicated that the defendant's business served as a place where other sexual services were offered, but not penile-vaginal intercourse. There was nothing on the printed "menu" of services to suggest that it included penile-vaginal intercourse; nor did the defendant or the masseuses say anything to the undercover detectives to suggest that it did. The massage menu itself states, "We do not offer full service or oral services under any circumstance. All of our offerings are disease-proof and designed for both our clients and our own personal protection." This assertion was supported by the search executed at the salon, which found "sex toys" but not condoms. It is also supported by the physical layout of the business, where the single massage room was separated from the rest of the salon only by a bifold door with "slats," and contained only a massage table, not a bed.

Nor did any of the e-mails offered in evidence suggest that penile-vaginal intercourse was permitted in the salon. Indeed, in one of the e-mails, discussed above, the defendant told an apparent customer that a particular masseuse "has beautiful breasts and she will allow light touching" but, he warned, "no other touching." Contrast *Commonwealth* v. *Mullane, supra* at 717-718 (judge's erroneous instruction regarding definition of "sexual intercourse" not prejudicial because prostitute offered undercover detective "anything," and jury could properly infer this included penile-vaginal penetration). Therefore, for these reasons, we vacate the defendant's conviction of maintaining a house of prostitution.

For these same reasons, we further conclude that judgment must be entered for the defendant because the evidence at trial was insufficient as a matter of law to support a finding beyond a reasonable doubt by a reasonable jury that the masseuses were in the defendant's establishment for the purpose of penile-vaginal intercourse, or that the defendant knew that the masseuses were there for that purpose. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). Because the evidence was insufficient as a matter of law, double jeopardy bars the defendant from being retried for this offense. See *Commonwealth* v. *Merry*, 453 Mass. 653, 660 (2009); *Berry* v. *Commonwealth*, 393 Mass. 793, 797-798 (1985).

4. *Conclusion.* For the reasons discussed above, we affirm the judgment of conviction on the indictment charging the defendant

with deriving support from the earnings of a prostitute. The judgment of conviction on the indictment charging the defendant with maintaining a house of prostitution is vacated, the jury verdict is set aside, and judgment is to be entered for the defendant.

*So ordered.*