NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-172                                          Appeals Court

COMMONWEALTH vs. CHARLES STEED.

No. 18-P-172.

Middlesex.    April 9, 2019. - June 11, 2019.

Present: Green, C.J., Sullivan, & Ditkoff, JJ.


Deriving Support from Prostitution. Trafficking. Evidence,
    Authentication, Hearsay. Practice, Criminal, Argument by
    prosecutor, Instructions to jury, Failure to object.


Indictments found and returned in the Superior Court
Department on March 21, 2017.

The cases were tried before Merita A. Hopkins, J.


Adam Us for the defendant.
Caitlin Lyta Gemmill, Assistant District Attorney, for the
Commonwealth.


GREEN, C.J. On appeal from his convictions of trafficking

of persons for sexual servitude and deriving support from the

earnings of a prostitute, the defendant challenges the

sufficiency of the evidence supporting the latter charge,

because police placed him under arrest before he received any

portion of the money paid by an undercover officer to a prostitute for sexual services as part of a "sting" operation. On the evidence in the case before us, we conclude that the interruption of the transaction before the defendant gained physical possession of his share of the proceeds does not bar his conviction on a charge of deriving support from a prostitute, as a share of the money was his, by prior arrangement, as soon as it was paid by the officer to one of the women trafficked by the defendant. Discerning in the defendant's other claims[1] no cause to disturb the judgments, we affirm.

Background. We summarize the evidence the jury could have found, viewed in the light most favorable to the Commonwealth. See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).

On January 12, 2017, a police sergeant with the Woburn Police Department began an undercover investigation into human trafficking. The officer began the investigation by locating an advertisement on Backpage.com, an "online classified" services website frequently used to advertise escort services. The officer's attention was drawn to a particular advertisement because it involved a telephone number that he recognized from

---

[1] The defendant also claims error in the admission of certain evidence and in the jury instructions, and contends that the prosecutor's closing argument created a substantial risk of a miscarriage of justice.

another investigation.  The advertisement contained images of two females and offered a "two girl special."  The advertisement gave two telephone numbers, one ending in 7659 and one ending in 6078, to contact the women to arrange a meeting.  The advertisement was labeled with a unique Backpage.com "Post ID" of 37877418.  The officer then prepared an undercover operation to contact the women in the advertisement.  He called and texted both numbers but received a response only from the 6078 number; the officer then arranged a "date" with the person on the other end of that telephone number.[2]  He arranged to meet two women for the price of $500 at a hotel in Woburn that evening.

The defendant drove two women, D.M. and V.G., to the designated Woburn hotel to meet the officer.  While en route, D.M. communicated with the officer by cell phone to let him know that she and V.G. were on their way to the hotel.  The defendant provided the women with condoms to bring on the date.  The defendant was nervous about the date and insisted that D.M. ask the officer to send a "dick pic" to her to verify that he was

---

[2] The officer explained that a "date" in that context described "a meeting . . . for the delivery of commercial sexual services."

not a police officer.[3]  D.M. then text messaged a photograph of herself and V.G. to the officer.[4]

The defendant dropped the two women off at the designated hotel in Woburn, where the officer was waiting.  The officer gave D.M. $500 in cash and discussed what he wanted them to do.  D.M. placed the $500 in her purse and sent a text message to the defendant saying, "We're good," meaning that she had the money.  At that point, the officer signaled to other officers waiting in adjoining hotel rooms, and they began interviewing V.G. and D.M.

Both women gave the officers their cell phones and consented to searches of those cell phones.  Through their interviews with V.G. and D.M., the officers were able to identify the other woman in the January 12, 2017, Backpage.com advertisement as O.S.  All three women testified at trial pursuant to a grant of immunity.

V.G. was present at the encounter at the Woburn hotel.  She met the defendant approximately two years prior to trial while homeless in Boston; the defendant saw her, pulled his car over, offered her "crack" cocaine, and gave her his cell phone number.

---

[3] The officer explained that a "dick pic" is a photograph of the prospective customer's penis.  The officer declined to send the requested picture.

[4] D.M. was one of the two women depicted in the Backpage.com advertisement for a "two girl special."

She knew the defendant by the nicknames "Rick," "Tyreki," and "Cash."  The "next time" she saw the defendant, she began working for him as a prostitute.  In exchange for her services, the defendant fed her cocaine and heroin addiction.  The defendant told her they "could make money," "took [her] to a store and bought [her] new clothes, took [her] to a house and gave [her] a shower[,] [a]nd put an ad on Backpage."  The defendant posted advertisements for V.G.'s sexual services online on Backpage.com; she witnessed him post those advertisements, which referred to her as "Honey," the nickname he gave her, "on multiple occasions."  She also saw the defendant pay for the advertisements on multiple occasions using "a prepaid card."  The defendant gave V.G. a cell phone on which customers could contact her to arrange a date.  The defendant also arranged hotel rooms for V.G. to meet with customers and drove her to those hotels or to customers' homes.  The only person who ever drove her to meet a customer was the defendant, and the defendant set all the monetary rates for her sexual services.  Dates with V.G. always involved sex.

In December 2016, V.G. was hospitalized for several weeks with a wrist infection that required surgery.  After her surgery, V.G. left the hospital against medical advice.  The defendant picked her up from the hospital with an intravenous line still in her body and brought her to a hotel in Boston,

where she "got high and started talking about working again; doing dates." The encounter with the Woburn police officer occurred less than twenty-four hours after the defendant picked her up from the hospital.

D.M., the other woman present at the encounter at the Woburn hotel, met the defendant in the summer of 2016 when she was addicted to heroin and "crack"; the defendant "picked [her] up for a date," which meant "sex for money," and told her afterward that he sold "crack," which she wanted. She knew the defendant by the name "Cash."

She began working for the defendant in October 2016, immediately after she was released from a drug treatment center. The defendant created advertisements for her sexual services that were "posted on Backpage." D.M. occasionally watched the defendant create these advertisements. The defendant set the "rate" for her sexual services and listed the number of the prepaid cell phone he gave her as the contact number on the advertisements. Customers contacted her by text messaging or calling her cell phone to set up dates, and the defendant drove her to those dates. The defendant sometimes spoke directly with those customers, and other times D.M. would speak with the customers. Dates with D.M. usually involved sex.

D.M. knew there was an advertisement for her services posted on Backpage.com on January 12, 2017, "[b]ecause we did it

every day," meaning that the defendant posted an advertisement for her on Backpage.com every day, "and [the] phone that [she] used never stopped ringing." D.M. paid the defendant fifty percent of her earnings from a date with a customer, but "inevitably it all went to [the defendant]" because she would also buy drugs from him. D.M. identified two of the images on the January 12, 2017, Backpage.com advertisement at trial as her own face and body, recognized her own cell phone number in the advertisement, and denied making the advertisement herself. She further testified that the defendant was "in control of every phone on every encounter," so he knew what the arrangements were with customers who responded to the Backpage.com advertisements.

Following the officer's meeting with V.G. and D.M. at the Woburn hotel, the defendant was pulled over on the highway by other officers, arrested, and searched. Inside the defendant's vehicle, officers located a large bag of condoms, numerous cell phones, and an unknown female's driver's license. The defendant had $1,190 in cash on his person at the time of arrest. Officers also seized a cell phone from the defendant's person; the number assigned to that cell phone ended in 9709. Business records showed that the 9709 cell phone number was registered to a "Cee Cash Brown"; this was also the same number listed in the cell phone obtained from D.M. under the contact name "C Cash" and in the cell phone obtained from V.G. under the

contact name "Cash." The cell phone in the possession of V.G. was a cell phone "used mostly" by the defendant "for business purposes." A forensic examination of that cell phone revealed an associated e-mail address of ceecash85@gmail.com, images of the defendant, and images of the women in various stages of undress. Finally, business records for the January 12, 2017, Backpage.com advertisement showed that the unique Backpage.com "Post ID" was registered to the same e-mail address, ceecash85@gmail.com, and had an associated telephone number ending in 9709 -- the same number as the cell phone in the defendant's possession.

O.S., whose photograph and telephone number also appeared in the Backpage.com advertisement to which the undercover officer responded on January 12, 2017, also testified at trial, though she was not present at the encounter at the Woburn hotel. The defendant first approached O.S. in the summer of 2016 when she was homeless in Boston and asked her if she would "like to party and make money." She knew him by the nicknames "C," "Cash," and "Rick." The defendant took her to Cape Cod to provide sexual services for payment. At the time, she was addicted to heroin and "crack." The defendant supplied her with drugs, which she would pay for out of her earnings while working for the defendant. She always paid the defendant forty percent of the proceeds of her dates and would then pay him additional

amounts for drugs. The defendant advertised her sexual services "on Backpage." The defendant was responsible for setting rates for her sexual services and always drove her to the dates. Though O.S. was not present for the date arranged at the Woburn hotel, she recognized various characteristics about the advertisement the undercover officer responded to. She identified two photographs of herself in the advertisement, identified the description "Nerd Librarian" in the advertisement as a nickname given her by the defendant, and identified one of the telephone numbers listed in the advertisement as being hers. She also recognized another photograph in the advertisement as depicting D.M.

Discussion. 1. Sufficiency of the evidence. To establish the crime of deriving support from the earnings of a prostitute under G. L. c. 272, § 7, the Commonwealth must prove "that a particular individual was a prostitute, that the defendant knew the individual was a prostitute, and that the defendant shared in some way in the earnings or proceeds of this person's prostitution." Commonwealth v. Purdy, 459 Mass. 442, 454 n.10 (2011).

The defendant's principal challenge to the sufficiency of the evidence rests on his observation that he did not receive any portion of the money paid by the undercover police officer to one of the women trafficked for sexual services on January

12, 2017, and his contention that evidence of his receipt of some portion of that money was essential to prove the crime.[5]  We reject the defendant's contention that interruption of the transfer to him of money paid for sexual services to a person he has trafficked precludes a conviction of deriving support from a prostitute on the basis of that payment -- at least in the circumstances of the present case.  D.M., who received payment from the undercover officer, testified that she would give the defendant fifty percent of her earnings from a date with a customer (and also testified that she had done so on numerous prior occasions).  In such circumstances, a rational jury could conclude that the defendant's share of the proceeds became his, by prior arrangement, as soon as payment was received by D.M., and that his share of the funds was simply held by her on his behalf pending her delivery of that share to him.[6]

---

[5] The defendant's challenge to the sufficiency of the evidence that he knew the women were prostitutes is without merit for a variety of reasons, not least because the women testified that they would pay the defendant a share of the funds received from dates the defendant arranged for them, that he drove them to and from those dates, and that he supplied them with condoms for use during their dates.  On such testimony, a rational jury could infer the defendant's knowledge that the women were prostitutes.  The defendant does not challenge the sufficiency of the evidence that the women whose services the defendant advertised on Backpage.com were prostitutes; their testimony acknowledged that they were prostitutes.

[6] We note as well that, though the indictment referred to the defendant's derivation of support from prostitution only "on or about the Twelfth day of January in the year of our Lord two

2.  Admission of Backpage.com advertisement.  The defendant's challenge to the admission of the January 12, 2017, Backpage.com advertisement is likewise without merit.  As a threshold matter, we observe that the defendant did not object to admission of the advertisement at trial.  "We generally do not consider the admission of evidence that was introduced without objection to be error, per se.  See Commonwealth v. Stewart, 398 Mass. 535, 543 (1986) ('hearsay evidence admitted without objection may be considered by the jury and may be given any probative value it possesses')."  Commonwealth v. Haggett, 79 Mass. App. Ct. 167, 174 n.10 (2011).  The purpose of the objection is to permit the trial judge an opportunity to ensure that inadmissible evidence is removed from the jury's consideration.  "If a timely objection is not made, the evidence is properly admitted, and the fact finder is entitled to give it such probative effect as it deems appropriate."  Mass. G. Evid. § 103(a) note, at 6 (2019).  However, even though the claim of error is unpreserved, we nonetheless consider whether the evidence was admissible and, if not, whether its admission

---

thousand and seventeen at Woburn," the evidence of the women's past practice of sharing proceeds from paid sexual encounters was admitted without limitation, and was relevant to establishing the nature of the ongoing business conducted by the defendant.

created a substantial risk of a miscarriage of justice. See Haggett, supra.

Contrary to the defendant's claim, admissibility of the Backpage.com advertisement did not depend on proof of the defendant's authorship of the advertisement. It was relevant to prove the offer of sexual services by two women, without regard to the identity of the person who authored, paid for, or posted the advertisement. The advertisement was sufficiently authenticated by the testimony of the undercover police officer, who identified it as the advertisement to which he responded when he arranged his meeting with the women at the Woburn hotel for paid sexual services. See Purdy, 459 Mass. at 447 & n.5. In any event, however, there was ample evidence that the defendant authored the advertisement, including the e-mail and telephone numbers furnished to Backpage.com incident to placing the advertisement (both of which were associated with the defendant), and the women's testimony that the defendant posted similar advertisements every day. See id. at 448.

3. Specific unanimity. As the Commonwealth observes, a specific unanimity instruction is not required when the Commonwealth does not proceed "'on alternate theories' of guilt." Commonwealth v. Arias, 78 Mass. App. Ct. 429, 432 (2010), quoting Commonwealth v. Santos, 440 Mass. 281, 287-288 (2003). In the present case, the Commonwealth based its

prosecution for human trafficking on but one theory of guilt --
an ongoing course of conduct by the defendant offering sexual
services of various women, including Internet advertisements to
solicit customers, driving them to and from arranged sexual
encounters with customers, and sharing in the proceeds from such
encounters.  No instruction on specific unanimity was required.[7]

4.  Closing argument.  Finally, we see no impropriety in
the prosecutor's closing argument, and therefore no substantial
risk of a miscarriage of justice.[8]  The prosecutor's argument
that the immunized witnesses were credible was based in the
evidence and did not constitute improper vouching.  See
Commonwealth v. Brewer, 472 Mass. 307, 315 (2015).  See also
Mass. G. Evid. § 1113(b)(3) (2019).  There also was evidence in
the record to support the prosecutor's comment that the
defendant "targeted" the women he trafficked for sexual
services, based on their homelessness and drug addiction.

Judgments affirmed.

---

[7] We note as well that the defendant did not request such an
instruction.

[8] Again, the defendant raised no objection at trial.