NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-542

COMMONWEALTH

vs.

VEE FAHNBULLEH.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a jury trial in the Superior Court, the defendant, Vee Fahnbulleh, was convicted of assault and battery by means of a dangerous weapon, armed robbery, and armed assault in a dwelling as a joint venturer with Kevin Lopez, Kristina O'Halloran, Jesse Peralta, and another man, known only as "Prince."[1]  On appeal he argues that the electronic communications were improperly admitted at trial because they were not authenticated and that his motion for a new trial, based on the Commonwealth's failure to disclose exculpatory

_____

[1] Prince was later identified as Martins Omonkhegbe, but he was referred to exclusively as Prince at the defendant's trial.

evidence, was wrongly denied. We affirm the judgments and the order denying the new trial motion.

Background. We set forth the basic facts that the jury could have found, reserving other facts for later discussion. In August 2016, the defendant and four others formed a plan to break into the Dighton home of Derek Desvergnes (victim) to steal money and marijuana. Lopez and O'Halloran, a woman who lived with the victim as his romantic partner but was also involved with Lopez, formed the plan and recruited three others to participate: Lopez's cousin, Peralta; the defendant, who was Peralta's close childhood friend; and Prince.

On the morning of August 27, the four men drove to the victim's home in two cars, a black Lexus belonging to the defendant and a Toyota belonging to Peralta's girlfriend. They entered the home, their faces covered with articles of clothing. The victim's father, who also lived there, awoke to the sound of a dog barking, then got up and saw the intruders smashing a glass door. He fled to a neighbor's house to call the police. The victim, who had been asleep in his bedroom with O'Halloran, encountered the intruders. They demanded money, restrained his hands with zip ties, struck him with a hammer and a pellet gun, and used a taser. Peralta entered the house after the others and left before them, returning to the Toyota. Lopez came out

2

of the house, placed a garbage bag containing jars of marijuana in the Toyota's trunk, and went back toward the house.

While Peralta waited in his car, the police arrived and apprehended him; the others fled.  The police later searched the other vehicle parked outside the home, the defendant's black Lexus.  Inside the Lexus they found a registration certificate for the vehicle in the defendant's name, three cellphones, the defendant's Rhode Island driver's license, and a photo identification card from the defendant's workplace bearing the name "Mickey Fahnbulleh."

Peralta first "made up a story" that he was present because he worked nearby; the police arrested him.  He later entered into a cooperation agreement with the district attorney's office and was the key witness at the defendant's trial.

Discussion.  1.  Authentication of text messages.  At trial, numerous text messages among the five codefendants were entered in evidence.  For the first time on appeal, the defendant argues that most of the text messages were not properly authenticated, that they should have been excluded, and that their admission created a substantial risk of a miscarriage of justice.

Authentication of electronic communications requires evidence sufficient to support a finding that the communications

are what their proponent claims them to be.  See Commonwealth v. Welch, 487 Mass. 425, 440 (2021); Mass. G. Evid. § 901(a) (2025).  The same authentication principles that apply to letters and telephone calls apply to electronic communications.  See Commonwealth v. Purdy, 459 Mass. 442, 448-450 (2011).  When the issue of authentication is raised at trial, the judge must make a preliminary finding that "the evidence was sufficient for a reasonable jury to find by a preponderance of the evidence that the [individual] authored the communications" (quotation omitted).  Welch, supra, quoting Commonwealth v. Webster, 480 Mass. 161, 170 (2018).

The defendant argues that the evidence did not establish that any of the authors of the text messages were who the Commonwealth claimed them to be.  It is true that a name on an account or device, standing alone, is insufficient.  See Purdy, 459 Mass. at 450.  However, authentication may be established through "confirming circumstances" that permit a finding of authorship or participation.  Id.  Confirming circumstances may be established with direct or circumstantial evidence, including the appearance, substance, and any distinctive aspects of the communications.  See Welch, 487 Mass. at 441.  See also Commonwealth v. Earl, 102 Mass. App. Ct. 664, 683 (2023) ("Authentication of an item may be proved by the contents of the

4

item itself").  Expert testimony, proof of exclusive access, or proof that the author physically typed the messages is not required.  See Welch, supra at 442; Purdy, supra at 451 n.7.  Finally, evidence that others may have used the device affects the weight of the evidence, not its admissibility.  See Purdy, supra at 451.

Here, the evidence included an interconnected web of confirming circumstances.  To begin, Peralta testified that, in addition to having in-person meetings with Lopez, the defendant, and Prince to plan the robbery, he also used a phone number ending in 8908 to communicate with Lopez about it.  When communicating with Peralta, Lopez used a number ending in 8810.  In messages extracted from Lopez's 8810 phone, Peralta's 8908 number was associated with Peralta's first name, "Jessi."  The day before the robbery, Lopez sent a text message to Peralta telling him, "Meet at [V]ees."  When Peralta pressed Lopez for details about the plan, Lopez responded, "Vee on that," and "Me and Vee already scooped [sic] out the crib and the get away route."

One of the phones seized from the defendant's Lexus had a phone number ending in 6976.  The defendant was the registered subscriber, and the phone had been named "Mickey's iPhone 6."  The passcode for the phone was the last four digits of the

5

defendant's social security number.  Data extracted from this phone included numerous communications about the robbery with Lopez's 8810 number, which on the defendant's phone was associated with Lopez's first name, "Kev."  In one message dated a few days before the robbery, Lopez sent the defendant the street address of the victim's house in Dighton, the same address Lopez had provided Peralta.  A string of instant messages extracted from the defendant's phone was an exchange with a number ending in 4397, associated with the name "Prince," about acquiring a getaway car.

Another corroborating set of messages extracted from the defendant's phone was a conversation with a contact identified as Marcus and others about a dishwasher, an electrician, preparation of a lease, and monthly rent payments.  Peralta testified that Marcus was the name of the defendant's housemate. In this conversation Marcus wrote, "Everybody text me your full name," and the defendant responded, "Vee Mickey Fahnbulleh." Finally, a lengthy string of texts extracted from Lopez's 8810 phone was a sometimes flirtatious exchange with a number ending in 3858, associated with the name "K*" -- as in Kristina O'Halloran -- during the week leading up to the robbery, in which K* described the activities and whereabouts of an unnamed man, whom the jury could infer was the victim, and his father.

6

Based on Peralta's trial testimony identifying the participants and describing their planning of the robbery; police and expert testimony regarding the seizure of the defendant's phone from his car, his ownership of the phone, and the data extracted from his phone; and the content of the messages themselves, including user names, time stamps, and detailed discussions of plans for the robbery, a reasonable jury could have concluded it was more likely than not that the defendant authored the communications associated with the 6976 number, and that Peralta, Lopez, O'Halloran, and Prince authored the messages associated with the numbers ending in 8908, 8810, 3858, and 4397, respectively.  See Commonwealth v. Lopez, 485 Mass. 471, 478 (2020) ("evidence of the contents of the messages, including identifying information and other corroborating evidence, together with evidence of the originating device, was sufficient to authenticate the communications as having been authored by the defendant").  As the electronic communications were properly authenticated and admitted in evidence, there was no error; therefore, "there can be no risk of a miscarriage of justice." R.B., petitioner, 479 Mass. 712, 718 (2018).

2.  Withholding of exculpatory evidence.  Under Mass. R. Crim. P. 14 (a) (1) (A), as amended, 444 Mass. 1501 (2005), in

7

effect at the time of the defendant's trial, the Commonwealth was required to disclose any statements made by a codefendant, by a person who testified before a grand jury, or by a person intended to be called as a witness. In addition, the defendant made a discovery request for the prior inconsistent statements of any witness expected to testify. Notwithstanding these discovery obligations, the Commonwealth withheld a recorded interview of Peralta, conducted by the Dighton police shortly after his arrest, and a recorded interview of the victim, conducted the next day. Both interviews included statements that were inconsistent with aspects of the witnesses' trial testimony. The defendant filed a motion for a new trial, arguing that the Commonwealth's failure to disclose this "crucial impeachment evidence" violated his State and Federal due process rights. The trial judge denied the motion.

A motion for a new trial may be granted "if it appears that justice may not have been done." Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001). We review the judge's denial of the motion for "a significant error of law or other abuse of discretion." Commonwealth v. Grace, 397 Mass. 303, 307 (1986). "[W]e grant special deference to a decision on a motion for a new trial of the judge who was also the trial judge." Commonwealth v. Tucceri, 412 Mass. 401, 412 (1992). However,

"[i]f the new trial claim is constitutionally based, this court will exercise its own judgment on the ultimate . . . legal conclusions." Commonwealth v. Diaz, 100 Mass. App. Ct. 588, 592 (2022), quoting Commonwealth v. Rodriguez-Nieves, 487 Mass. 171, 176 (2021).

"To obtain a new trial on the basis of nondisclosed exculpatory evidence, a defendant must establish (1) that the evidence [was] in the possession, custody, or control of the prosecutor or a person subject to the prosecutor's control; (2) that the evidence is exculpatory; and (3) prejudice" (citations and quotations omitted). Commonwealth v. Sullivan, 478 Mass. 369, 380 (2017). There is no dispute that the Commonwealth possessed and withheld the recorded interviews, which could have been used for impeachment purposes, and were therefore exculpatory. See Commonwealth v. Murray, 461 Mass. 10, 19-20 (2011); Diaz, 100 Mass. App. Ct. at 594. Accordingly, the only issue is whether the defendant established prejudice.

Where a defendant makes a general request, or no request, for exculpatory evidence, to be entitled to a new trial the defendant must establish prejudice by demonstrating "a substantial risk that the jury would have reached a different conclusion if the evidence had been admitted at trial." Tucceri, 412 Mass. at 413. When nondisclosure follows a

9

specific request, however, "a standard of prejudice more favorable to the defendant is justified." Commonwealth v. Pope, 489 Mass. 790, 801 (2022). In that situation, the "defendant need only demonstrate that a substantial basis exists for claiming prejudice from the nondisclosure." Id., quoting Tucceri, supra at 412. "In judging whether the defendant has shown prejudice [under the standard for specific requests], we must decide whether there is a reasonable possibility that the nondisclosed evidence would have made a difference" (quotation and citation omitted). Diaz, 100 Mass. App. Ct. at 595.

Here, there is no dispute that the motion should have been decided under the standard applicable for specific requests. See Rodriguez-Nieves, 487 Mass. at 179 n.12 (mandatory discovery provisions of rule 14 "deemed a specific request for all statements of persons the party intends to call as witnesses" [quotation and citation omitted]). At one point in her decision on the new trial motion, however, the judge erroneously quoted Commonwealth v. Gaines, 494 Mass. 525, 541-542 (2024), for the more demanding "substantial risk" standard applicable when there is no request or only a general request.

Nonetheless, conducting our independent review of the constitutional question whether the defendant demonstrated a reasonable possibility that the withheld evidence would have

10

made a difference in the outcome of the trial, we agree with the judge, for essentially the same reasons she articulated, that the defendant did not make such a showing.

In the undisclosed, recorded police interview, Peralta identified Lopez and O'Halloran as being involved in the robbery, but stated that he did not know the identities of the remaining participants. When specifically asked if he knew "someone by the first name of Vee," he denied it. On cross-examination during trial, however, Peralta admitted that, during his initial interview with the Dighton police, he "immediately finger[ed]" Lopez and O'Halloran, but did not identify the remaining participants. He acknowledged that he did not disclose the defendant's involvement until after he decided to cooperate with the district attorney's office. Thus, the fact that during the recorded interview he likewise refused to divulge the name of his close childhood friend was, as the judge found, "cumulative of evidence that was elicited during cross-examination."[2]

Although Peralta was the Commonwealth's key witness, unlike in Pope, 489 Mass. at 801, his testimony was not "riddled with

---

[2] Indeed, the withheld recorded interview of Peralta was cumulative of the information contained in the police report provided to the defense, which stated that Peralta "claim[ed] there was only he, his cousin, and two other male parties unknown to him going into the home."

11

inconsistencies."  Nor did this case rise and fall with Peralta's credibility.  See id.  The defendant's abandoned car, identification, and cell phone were found at the crime scene, and his electronic communications implicated him in the planning and commission of the crime.  Defense counsel effectively cross-examined Peralta with his initial failure to name the defendant, his incentive to curry favor with the prosecution by entering into a cooperation agreement, and his late disclosure of the defendant's participation.  We agree with the judge that "the evidence at trial of the defendant's culpability was overwhelming and did not primarily rely upon witness credibility," and that Peralta's cumulative, recorded interview "would not have been a real factor in the jury's deliberations."

The recorded interview of the victim was inconsistent with his trial testimony that he heard one of the intruders say to another, "Vee, shoot this n-----."  In the victim's recorded interview, when he reported that one of the intruders told another to shoot him, he did not tell the police that any intruder said the name "Vee."[3]  However, the victim's grand jury

---

[3] While the victim's reference to "Vee" at trial was certainly harmful to the defendant's case, the transcript does not support the defendant's claim in his brief that "the jury was left with the impression that [the victim] heard the name 'Vee' multiple times."

12

testimony was consistent with his trial testimony in this regard. It is possible that defense counsel could have used the victim's recorded interview to establish that the name "Vee" might have been suggested to the victim in the short period between the crime and his grand jury testimony, thereby impeaching the victim's claim that he heard the defendant's name during the commission of the crime. Even so, given the strength of the Commonwealth's case, depriving the defendant of this narrow avenue of impeachment did not create a reasonable possibility that the outcome of the trial would have been different. Unlike Pope, 489 Mass. at 801-802, this is the ordinary case where the failure to disclose evidence tending merely to impeach a witness does not warrant a new trial.

Judgments affirmed.

Order denying motion for new trial affirmed.

By the Court (Meade, Massing & Brennan, JJ.[4]),

*Paul Little*

Clerk

Entered: March 19, 2026.

---

[4] The panelists are listed in order of seniority.