NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

12-P-1673                                          Appeals Court


COMMONWEALTH  vs.  DAVID OPPENHEIM.[1]


No. 12-P-1673.

Hampshire.     May 9, 2014. - September 24, 2014.

Present:  Cohen, Sikora, & Agnes, JJ.


Evidence, Admissions and confessions, Authentication,
     Credibility of witness, Cross-examination.  Practice,
     Criminal, Admissions and confessions, Instructions to jury,
     Reasonable doubt.  Jury and Jurors.  Witness, Credibility,
     Cross-examination.




     Indictments found and returned in the Superior Court
Department on July 13, 2010.

     The cases were tried before Mary-Lou Rup, J.


     David J. Nathanson (Dan A. Horowitz with him) for the
defendant.
     Thomas H. Townsend, Assistant District Attorney, for the
Commonwealth.


     SIKORA, J.  A Superior Court jury convicted the defendant,

David Oppenheim, of five counts of rape of a child.  See G. L.

_____

     [1] Justice Sikora participated in the deliberation on this
case and authored the opinion prior to his retirement.

c. 265, § 23.  He appeals upon multiple grounds, but argues principally that the trial judge should have instructed the jury that, before they could consider a confession contained in an instant message (IM) conversation,[2] the Commonwealth needed to prove beyond a reasonable doubt that the defendant authored the confession.  For the following reasons, we affirm.

Background.  1. Commonwealth's evidence.  From the Commonwealth's main witnesses, the jury heard the following evidence.  We reserve certain details for discussion of the appellate issues.  In 2002, the defendant and his wife founded a community theater enterprise entitled the Pioneer Arts Center of Easthampton (PACE or the center).  As the center's chief executive, the defendant directed musical theater and taught acting classes.

The victim, Ann Ross,[3] testified at length.  She first attended PACE activities in the fall of 2004 at the age of thirteen.  She remained actively involved at the center over the next four years.  She first performed volunteer and intern

_____

[2] Instant messaging is "a form of computer communication in which individuals hold an online conversation via the [I]nternet. . . .  [The] message is transmitted instantaneously . . . allow[ing] both parties . . . to respond immediately."  Commonwealth v. Disler, 451 Mass. 216, 218 n.3 (2008), quoting from State v. Lott, 152 N.H. 436, 437 (2005).

[3] A pseudonym.

chores, then took acting lessons, and ultimately assumed significant roles in musical productions.

In the fall of 2005, when she was fourteen years old, Ross accepted the defendant's offer of private acting lessons. The classes usually took place in the defendant's office or the theater. The defendant told Ross that, to improve her acting skill, she needed to experience physical sensations beyond the knowledge of her age group. He rubbed her arms and kissed her lips, face, and neck. He told her that she was "really talented," that she was "going to go far[,] and that he was going to make sure that that happened." He instructed her not to tell anybody about their lessons because "society doesn't understand what I'm doing here."

Ross testified that the sexual activity intensified over the next two years. The defendant touched Ross "everywhere," including her vagina; performed oral sex on her; engaged her in anal and vaginal sex; and directed her to perform oral sex on him. Ross had no prior experience in these activities. They occurred usually at the defendant's office or home, or at the theater.

The Commonwealth's second principal witness was Ryan DiMartino.[4] DiMartino had attended PACE's musical theater

---

[4] At trial, in February, 2012, DiMartino testified that he had been born and raised as a female, but that after the events

training during the summers of 2005, 2006, and 2007, at fourteen, fifteen, and sixteen years of age. During those years DiMartino was known as Emily and lived as a female. In the course of the summers, DiMartino met, and developed an undisclosed romantic attraction toward, Ross. During those periods DiMartino observed Ross and the defendant often alone in close working proximity.

During the school year of 2007-2008, at age sixteen, DiMartino performed volunteer work at PACE. On Wednesday afternoons and evenings DiMartino cleaned and prepared the theater for evening open microphone activities. The defendant would admit DiMartino to the locked theater. They began online chats in October. As of the end of 2007 and the beginning of 2008, the conversations between them became personal and then, according to DiMartino, "more flirtatious and sexual."

During a Wednesday afternoon in early February of 2008, at the locked theater, the defendant kissed and caressed DiMartino. That conduct became a pattern during private Wednesday afternoon chores at the theater. The defendant proposed also that they engage in sexual relations.

---

at issue he had identified as transgender, transitioned to life as a man, and in October of 2010 changed his name to "Eli Ryan DiMartino." For consistency, we shall use his trial-time identity and, as necessary, employ masculine pronouns.

On February 13, the defendant suggested to DiMartino that he (the defendant) open a new online account with a new online name to mask his identity against any suspicion of DiMartino's parents or others about their IM traffic. The defendant and DiMartino changed the defendant's IM identity to the name "Allie."

On or about March 9, the defendant and DiMartino discussed, in person, DiMartino's attraction to Ross. The defendant urged DiMartino to pursue it. DiMartino asked the defendant whether any sexual activity "was happening between [Ross and him]." The defendant responded that they could "talk about it another time" because he "wasn't sure if he trusted [DiMartino] enough to tell [him] everything."

Late the following evening of March 10, the defendant opened an IM conversation with DiMartino about his (the defendant's) relationship with Ross. In the course of the extended IM conversation, the defendant related in physical detail a first seduction of Ross at about age fourteen in the sound booth of the PACE theater and the accomplishment of both vaginal and anal penetration of her on that occasion. The IM related that the defendant had maintained a pattern of sexual intercourse with Ross through the time of her relationship with one boyfriend and into the beginning of her relationship with a successor (college) boyfriend.

Subsequently, on a Wednesday afternoon at the PACE theater, the defendant told DiMartino again that he (the defendant) on multiple occasions had engaged in vaginal and anal sex with Ross in the office and in the light booth of the PACE theater complex.

Carissa Dagenais was the Commonwealth's third principal witness. From 2004 to late 2006, at ages fifteen to seventeen, she too performed volunteer work at PACE, and took an acting class from the defendant. She was familiar with Ross as another member of the acting class.

During her first year of college (2007-2008), Dagenais frequently stayed at the defendant's house because she was "having a hard time at home." In the summer of 2008, she asked the defendant why she no longer saw Ross at PACE. He answered that Ross and he had once had a "full-on sexual relationship," that she "had started seeing someone else," and that they had not enjoyed their collaboration in their last musical production.

In June of 2010, after publication of the charges against the defendant, he asked Dagenais to appear as a character witness on his behalf. She at first agreed. In July of 2010, she decided to report her information about the defendant's relationship with Ross to the police. In a telephone conversation with the defendant, she informed him of that

intention.  He acknowledged the wrongfulness of his actions, but described the law and his potential punishment as unfair.  He told her that her testimony would ruin his and his family's lives.

The Commonwealth offered the testimony of two other former PACE students as pattern-of-conduct evidence.  Laura Berkeley[5] began an internship in the fall of 2003 at age seventeen.  The defendant offered her private acting lessons and proposed the technique of accelerated "primitive" experiences for professional development.  The tutorial resulted in sexual activity (fellatio, cunnilingus, and digital and vaginal intercourse) in the PACE office area, the green room, and the sound booth, and at the defendant's home.  Her internship concluded in the spring of 2004.

Marit Bjerkadal participated at PACE during the period of 2003 into early 2005 at ages sixteen, seventeen, and eighteen.  She performed volunteer chores to defray the cost of acting lessons for her younger sister and herself.  She testified that, in the winter of 2005, the defendant approached her privately, massaged her shoulders, and proposed payment by sexual favors.  She became frightened and left PACE shortly afterward.

---

[5] A pseudonym.

2.  Defendant's evidence.  Through the testimony of the defendant's wife and multiple PACE attendees, the defense emphasized that the defendant and his wife had shared the management of PACE and often worked there from early morning to late evening.  Their presence on site, together or separately, depended on the variable circumstances of productions, classes, maintenance, and appointments, and was generally unpredictable.  The level of activity, the presence of volunteers on irregular schedules, and the accessibility of the theater to as many as fifteen persons with keys would preclude the degree of privacy and secrecy needed to carry out the patterns of conduct alleged by the Commonwealth.  The defendant testified.  He denied the accusations of sexual activity by all students.

Analysis.  1.  Admissibility of March 10 IM confession. Before trial both the defendant and the Commonwealth submitted motions in limine addressing the admissibility of IM conversations between the defendant and DiMartino, particularly the March 10 narration of the first instance of the defendant's sexual intercourse with Ross.  The judge conducted an evidentiary hearing at which DiMartino testified to the same information later offered at trial concerning the March 10 communication, including commencement of such messages in October of 2007, and the online name change and preliminary discussions of February 13 and March 9, respectively.

When the prosecutor asked DiMartino what evidence convinced him that the defendant had authored the March 10 IM, DiMartino answered that "the tone and language was [what] I was used to having with [the defendant], the way we would talk in the [PACE] cafe." DiMartino added that the IM referred to prior in-person conversations between the two, including discussions about DiMartino's boyfriend, his mother's anger about his late-night presence at the defendant's house, and the defendant's sexual relationship with his wife.[6]

Defense counsel asked the judge to exclude the IM conversations in their entirety for lack of proof of their authenticity, especially because the Commonwealth had not conducted a forensic examination of DiMartino's computer. The judge concluded that sufficient evidence "allow[ed] a reasonable jury to find by a reasonable preponderance of the evidence that the defendant is the author of the language attributed to him" in the IM conversations. She allowed the Commonwealth's motion

---

[6] On cross-examination, DiMartino acknowledged that other people worked in the defendant's office. DiMartino conceded that no one had examined his computer, that he "suppose[d]" hacking into a person's instant messenger account "can be done relatively easily," and that "[i]t's possible" that "even if you don't hack into someone's account, it's very easy to download the [IM] communication and just change the words around." DiMartino admitted also that he did not produce all of his IM communications with the defendant when he first spoke to the police.

to admit them, and denied the defendant's motion to exclude them.

At trial, defense counsel objected to the admissibility of the IM conversations again for lack of authentication.  The judge again rejected the argument:

> "I'm satisfied, based on the earlier testimony from [DiMartino], as well as today's testimony, that there is sufficient . . . evidence corroborating the fact that this is a conversation between [DiMartino] and the defendant to make it admissible.  Issues as to whether or not there could have been someone else who was typing this in and responding go to the weight and not the admissibility.

> "As before, I refer to, I believe, it's the Purdy decision [Commonwealth v. Purdy, 459 Mass. 442 (2011)], as setting forth the foundation that needs to be made before this type of electronic conversation can be admitted."

She informed the parties that she intended to instruct the jury that, before they could consider an IM conversation between the defendant and DiMartino, they must be satisfied by a preponderance of the evidence that "it was the defendant who [was] on the other side of this conversation."  That formulation followed the language of Commonwealth v. Purdy, 459 Mass. at 447.  Accord Mass. G. Evid. § 901(b)(11) (2014).  She rejected defense counsel's position that "since it's a statement of the defendant, [the jury] should have to be persuaded beyond a reasonable doubt that it's the defendant."  Before the offer in evidence of DiMartino's description of the March 10 IM confession, she instructed the jury to find, by a preponderance

of the evidence, the defendant to be the author of the IM confession before they considered its contents.[7] DiMartino read aloud portions of both the February 13 (name change) and March 10 (first encounter) IMs; the Commonwealth introduced the text of both in evidence.

At the conclusion of all the evidence, defense counsel repeated the request for an instruction requiring the jury to be satisfied beyond a reasonable doubt of the defendant's authorship of the IMs.[8] The judge denied the request. She

---

[7] "Please understand that before you can consider these conversations at all, you must first be persuaded that the person on the other side of this conversation is, in fact, the defendant. The prosecution has to prove that to what's called a preponderance of the evidence, which means that the evidence must convince you that it's more likely true than not that the person on the other end of this conversation, the person who is authoring the other side of the conversation was, in fact, the defendant. If you're not convinced that the person on the other end of the conversation -- if you're not convinced that it's more likely true than not that the other person on the conversation was, in fact, the defendant, then you may not consider this conversation at all against the defendant. So you have to make that preliminary decision as to whether or not the evidence proves it's more likely true than not that the defendant is the person at the other [end] of this conversation before you may consider any of this conversation at all against the defendant. And in making that decision, you may consider all of the circumstances about which you will hear evidence regarding the time of the conversation and other information as well."

[8] "You have heard testimony that certain electronic messages were sent by the defendant. Before you may even consider these messages as evidence, you must be satisfied beyond a reasonable doubt that the defendant actually created and transmitted these messages. If you do not find that these messages were created

instructed the jury that they could consider an IM conversation if "convince[d]" that the defendant "was the author of those portions of the conversation . . . attributed to him . . . . If the evidence does not persuade you that [the defendant] was the author of those statements, you must disregard the instant message conversation in your deliberations."

On appeal the defendant pursues the contention that the IM confession of March 10 requires a finding of authorship beyond a reasonable doubt (1) because confessions carry potent probative force, and (2) because online communications carry a susceptibility to impersonation or fabrication, especially in the absence of forensic confirmation. For several reasons we decline to extend the standard of proof beyond a reasonable doubt to the admissibility of online admissions and to the jury's acceptance of their authorship.

a. Preliminary facts. It is axiomatic that the prosecution must establish each prima facie element of a crime by proof beyond a reasonable doubt. However, the "prevailing general rule" in the Commonwealth is that the preponderance of the evidence standard applies to resolve "preliminary facts bearing on conditional or logical relevance." Commonwealth v. Bright, 463 Mass. 421, 428, 432 (2012). See Commonwealth v.

---

by the defendant, you should disregard the messages and any testimony about them."

Rosenthal, 432 Mass. 124, 127 n.4 (2000) ("Although the
Commonwealth must, of course, prove all essential elements of
the crime beyond a reasonable doubt . . ., preliminary questions
of fact need only be proved by a preponderance of the
evidence"); Commonwealth v. Toon, 55 Mass. App. Ct. 642, 655
n.18 (2002) ("The Commonwealth need not prove each subsidiary
fact beyond a reasonable doubt before an inference is permitted
as to an essential element of the offense. . . .  Only the
elements of the offense need be proven beyond a reasonable
doubt").  See also United States v. Holmquist, 36 F.3d 154, 168
(1st Cir. 1994) (rejecting argument that proponent must
establish authentication beyond a reasonable doubt).  Although
we recognize that the "stronger the link between preliminary and
ultimate factfinding, the greater the danger that error in the
former will distort the reliability of the latter," Saltzburg,
Standards of Proof and Preliminary Questions of Fact, 27 Stan.
L. Rev. 271, 283 (1975), we are not persuaded to require proof
beyond a reasonable doubt of the preliminary fact of authorship
of electronically transmitted confessions.  Several
considerations lead to that conclusion.

First, as a matter of authority, the Supreme Judicial Court
has concluded that, before admitting an electronic communication
in evidence, a judge must determine whether sufficient evidence
exists "for a reasonable jury to find by a preponderance of the

evidence that the defendant authored" the communication. Commonwealth v. Purdy, 459 Mass. at 447. See Mass. G. Evid. § 901(b)(11) & Note (2014). Care & Protection of Laura, 414 Mass. 788, 792 (1993) ("Thus, in criminal cases, the heightened burden of proof is not applied to subsidiary facts, but rather only to the elements of the crime charged"). We agree with the trial judge's conclusion that Purdy strongly indicates that the preponderance of the evidence standard governed the jury's determination whether the defendant authored the IM confession. As argued by the Commonwealth in its brief, "It makes no sense for a judge to ask herself whether a jury could find by a preponderance of the evidence that the defendant sent the IMs only later to instruct the jurors that they must [make this finding] beyond a reasonable doubt." See Commonwealth v. Bright, supra (rejecting proposed rule that "would result in the judge and jury each applying a different standard in determining whether to admit the out-of-court statements of coventurers").

Furthermore, the preponderance of evidence standard applies to the admissibility and jury's consideration of facts even highly probative of guilt. The United States Supreme Court has held that a "guilty verdict is not rendered less reliable or less consonant with [the standard of proof beyond a reasonable doubt] simply because the admissibility of a confession is determined by a less stringent standard." Lego v. Twomey, 404

U.S. 477, 487 (1972). See Bourjaily v. United States, 483 U.S. 171, 175 (1987) (admissibility of evidence may hinge on preliminary factual questions resolved by proof by reasonable preponderance). See also Commonwealth v. Azar, 32 Mass. App. Ct. 290, 292, 298-302 (1992), S.C., 435 Mass. 675 (2002), in which the jury convicted the defendant of murder in the second degree upon evidence that included his prior bad acts of battering the victim. On direct appeal, Azar argued that the trial judge wrongly failed "to instruct the jury that prior bad acts of the defendant . . . had to be proved beyond a reasonable doubt." Id. at 309. Despite the inculpatory force of prior bad acts, we rejected the proposed necessity of their proof beyond a reasonable doubt. Ibid.[9]

b. Confirming circumstances. In Commonwealth v. Purdy, supra at 449, the court approved of a reasonable preponderance standard of admissibility of electronic communications because

---

[9] The defendant cites Commonwealth v. Tucker, 189 Mass. 457 (1905), in support of a requirement that a jury find authorship of an inculpatory communication beyond a reasonable doubt. In that instance the Commonwealth introduced handwritten sales slips to show that the defendant had authored a separate document. Id. at 470. The judge instructed the jury that "unless the Commonwealth shows by . . . proof beyond a reasonable doubt, that the writing upon these slips was actually made by the defendant, . . . the jury should wholly disregard them and all the great body of evidence which they have heard about them." Id. at 473. The Supreme Judicial Court disposed of the appeal on other grounds; it did not reason or hold that the Commonwealth must prove authorship beyond a reasonable doubt. Id. at 475.

"confirming circumstances" beyond the sender's self-identification tended to corroborate the authenticity of the message from the apparent author.  DiMartino provided such circumstances for the March 10 IM.  They included the familiar tone of the exchange, the sender's references to prior discussions with DiMartino about DiMartino's boyfriend's height, DiMartino's mother's anger, the height and personal habits of the sender's wife, the sender's recent decision to shave his beard, the location of DiMartino's bedroom window at home, the sender's approaching appointment with a client in South Deerfield, and mention of the sender's son.  DiMartino knew of these elements and could have manufactured their appearance in the prolonged IM conversation over its intermittent span of almost four hours.  However, that effort would have been elaborate and generally inexplicable.

c.  <u>Humane practice analogy</u>.  We have weighed the analogy proposed by the defendant to the Massachusetts humane practice rule.  That instruction directs a jury to disregard incriminating statements attributed to a defendant unless the Commonwealth proves beyond a reasonable doubt that the defendant made the statements voluntarily.  See <u>Commonwealth</u> v. <u>Tavares</u>, 385 Mass. 140, 149-150, cert. denied, 457 U.S. 1137 (1982); <u>Commonwealth</u> v. <u>Watkins</u>, 425 Mass. 830, 834-835 (1997).  The defendant correctly notes that the "usual terms" of the

instruction forbid jurors to consider incriminating statements unless persuaded "beyond a reasonable doubt, after considering all the evidence, that the defendant had made the statements and that they were voluntary as a 'product of his own free will and his rational intellect'" (emphasis supplied). Commonwealth v. Almonte, 444 Mass. 511, 522 (2005). See Commonwealth v. Watkins, supra at 835.[10]

However, the humane practice rule "responds to two specific concerns" not present here. Commonwealth v. Bright, 463 Mass. at 433. One is the inducement of an admission or confession "by trained interrogators wielding the authority of the State." Ibid. The rule stands guard against the powerful evidentiary effect of any guile, pressure, or coercion employed by governmental interrogation. The second is the constitutional policy of art. 12 of the Massachusetts Declaration of Rights prohibiting the compulsion of an accused to "furnish evidence against himself." Commonwealth v. Hoyt, 461 Mass. 143, 152 n.11 (2011), quoting from art. 12 of the Massachusetts Declaration of Rights.. In this case, the IMs at issue passed between two private individuals engaged in voluntary communication. Both the letter and the purpose of the humane practice rule appear inapplicable. We see no inclination of the court in the Purdy

---

[10] For an excellent synopsis of the rule, see Brodin & Avery, Massachusetts Evidence § 12.1, at 644-647 (8th ed. 2007).

or the Bright decisions to extend an elevated standard of proof for admissibility and ultimate fact finding to general electronic messaging between private communicants in voluntary circumstances.

Finally, we conclude that the judge correctly conveyed the standard of reasonable preponderance to the jury in her final charge. During DiMartino's testimony, she properly instructed the jury that "the evidence must convince you that it's more likely true than not" that the defendant authored the IMs attributed to him. Although the final charge instructed the jury to be "convince[d]" or "persuade[d]" by the evidence, we are satisfied that, after receipt of the contemporaneous and final instructions, the jury understood the duty to find it "more likely true than not" that the defendant authored the IM confession before they could consider it. See, e.g., Commonwealth v. Cryer, 426 Mass. 562, 572 (1998) ("In determining the propriety of a jury instruction, we must consider the instruction in the context in which it was delivered, in order to determine its probable effect on the jury's understanding of their function"). In particular, the use of the word "convince[d]," if anything, connotes a requirement greater than a mere reasonable preponderance.

In sum, in response to an objection to the authenticity or authorship of a self-inculpatory electronic message, the judge

will determine its admissibility and the jury its credibility by a reasonable preponderance of the evidence.  Counsel will be able to contest both issues by argument regarding the presence or the absence of confirming circumstances.

2.  <u>Witness character evidence</u>.  The defendant argues that the prosecutor improperly elicited testimony of the "good character and good works" of multiple prosecution witnesses, including Ross, DiMartino, Dagenais, Berkeley, and Bjerkadal; and that in closing comments the prosecutor improperly exploited that testimony "to bolster the credibility" of those witnesses. The prosecutor did call for testimony of those witnesses' educational achievements, professional aspirations, and extracurricular activities.  In particular she established that each of them had gone forward to serious college programs in the arts or other disciplines.

As a general rule, "evidence of a person's character is not admissible to prove that he acted in conformity with that character on a particular occasion." <u>Commonwealth</u> v. <u>Bonds</u>, 445 Mass. 821, 829 (2006), quoting from Liacos, Brodin, & Avery, Massachusetts Evidence § 4.4.1, at 130 (7th ed. 1999).  See Mass. G. Evid. § 404(b) & Note (2014).  In this instance the defendant did not object to the introduction of the credentials of the enumerated prosecution witnesses.  Consequently we inspect the issue for the presence of error and a resulting

substantial risk of a miscarriage of justice; we assess the evidence as a whole, and consider (i) the strength of the Commonwealth's case, (ii) the precise nature of the claimed error, (iii) the significance of the error, and (iv) the possibility that the omission of objection resulted from a reasonable tactical decision.  Commonwealth v. Azar, 435 Mass. at 687.  Under those criteria, relief is rare.  See, e.g., Commonwealth v. Randolph, 438 Mass. 290, 297-298 (2002).

Here, if we assume without deciding that some excessive credentialing reached the jury, it would not approach the level of the requisite substantial risk.  First, the strength of the Commonwealth's case was considerable.  Five percipient witnesses testified to a pattern of conduct.  The jury assessed each witness's credibility and the credibility of the defendant, all under direct and cross-examination.  The jury received evidence of an electronic confession and testimony of four other oral admissions from DiMartino and Dagenais.  The significance of incremental biographical data was not appreciable amid the total evidence.

Second, defense counsel made tactical use of DiMartino's crowded curricular and extracurricular agenda during involvement with PACE.  Defense counsel cross-examined him vigorously to propose that these augmented activities and certain personal and

family matters kept DiMartino occupied, stressed, and removed from events at the center.

The prosecutor's references to the subsequent accomplishments of the witnesses in closing argument did not constitute error, and certainly not error creating a substantial risk. The rule is that a "prosecutor may make a fair response to an attack on the credibility of a government witness." Commonwealth v. Chavis, 415 Mass. 703, 713 (1993), citing Commonwealth v. Simmons, 20 Mass. App. Ct. 366, 371 (1985). See Commonwealth v. Smith, 404 Mass. 1, 7 (1989). In his immediately preceding summation, defense counsel had characterized the prosecution's main witnesses as untrustworthy "actresses."[11] The prosecutor was entitled to cite their achievements as a responsive indication of their reliability.

3. Cross-examination of DiMartino. Because the prosecutor elicited favorable background information from DiMartino, the judge permitted defense counsel "some leeway" for impeachment of

_____

[11] He argued:

"Let's never lose sight of the fact, ladies and gentlemen, that all of these people that testified in this case, they're all little actresses, they're all into the drama. And, when you have a place like PACE that accepts everyone, that's open to everyone, you're going to draw people with baggage. You're going to draw people like Ryan DiMartino and Carissa Dagenais. People who I suggest to you are unstable people. We don't screen people when they come to PACE. They accepted pretty much everyone. You're going to attract people like Laura [Berkeley]."

his character.  Defense counsel proposed a range of subjects.
The judge allowed all but two:  DiMartino's involvement in self-
mutilation (cutting) and bondage.  The judge did not consider
self-mutilation to be relevant, and feared that testimony about
bondage would "inflame the jury."  Defense counsel objected to
the restriction; we therefore review the issue for prejudicial
error.  See Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994).

"The established rule is that an appellate court will not
overrule a trial judge's determination as to the proper scope of
cross-examination unless the defendant shows a clear abuse of
discretion and prejudice."  Commonwealth v. Crouse, 447 Mass.
558, 572 (2006).  See Mass. G. Evid. § 611(b)(1) & Note (2014).
Here the judge permitted defense counsel to question DiMartino
about multiple sensitive topics, including struggles with gender
identity and change, the deaths of family members, depression
and medication, and multiple sexual preferences and practices.
The judge reasonably could draw a line short of questions
regarding self-mutilation and bondage upon the ground that
prejudicial impact then overrode probative value.  That
limitation did not abuse discretion or create any error.  Any
putative error would have had little or no effect on the

verdicts.  See <u>Commonwealth</u> v. <u>Flebotte</u>, <u>supra</u>; <u>Commonwealth</u> v. <u>Graham</u>, 431 Mass. 282, 288 (2000).[12]

4.  <u>Empanelment of students</u>.  General Laws c. 234A, § 3, inserted by St. 1982, c. 298, § 1, provides that "[n]o person shall be exempted or excluded from serving as a grand or trial juror because of . . . occupation."  In <u>Commonwealth</u> v. <u>Brown</u>, 449 Mass. 747, 772 (2007), the court interpreted the statute to mean that "[s]tudents are not to be excused simply by virtue of their occupation.  As with any other hardship excuse[s], those for students must be based on an individualized finding and not a blanket rule."  On appeal the defendant contends that the judge "systematically excused" students and as a result created a substantial risk of a miscarriage of justice because college-age jurors more likely would understand the susceptibility of instant messaging to falsification.

Jury selection began on January 23, 2012, and consumed almost five days.  The judge informed each day's venire that the trial would extend into early February.  On each morning she advised the venire generally that "this county [Hampshire] [has]

---

[12] We have considered the defendant's remaining evidentiary arguments (1) that the judge wrongly excluded testimony about a Web log (blog) post from Dagenais undermining her credibility, and (2) that the judge wrongly permitted cross-examination of the defendant about an electronic mail (e-mail) photograph belatedly disclosed by the Commonwealth.  Neither ruling constituted error causing prejudicial harm to the defendant.

a large number of students," and that "if you're a full-time student and you feel it would be a real hardship for you to miss that many classes, you should bring that to my attention, because that could certainly be grounds for excusing you." This phrasing remained consistent for each venire.[13]

Over the five-day empanelment the judge excused a total of nineteen students for hardship, seventeen college students and two high school students. Defense counsel did not object to any of the excusals. The judge seated one student as a juror. ("I'm a student but I think I can handle the hardship.")

The assertion of improper systematic exclusion for occupation fails upon two independent grounds. First, G. L. c. 234A, § 74, inserted by St. 1982, c. 298, § 1, requires prompt objection by a party to any "irregularity or defect" in the empanelment process.[14] "Under [that provision], a defect in jury empanelment does not warrant reversal unless a defendant

---

[13] Hampshire County contains Amherst College, Hampshire College, Mount Holyoke College, Smith College, and the University of Massachusetts at Amherst.

[14] In relevant part, the statute reads:

"Any irregularity in . . . selecting, . . . excusing, . . . [or] impanelling . . . jurors; . . . or any defect in any procedure performed under this chapter shall not be sufficient . . . to set aside a verdict unless objection to such irregularity or defect has been made as soon as possible after its discovery or after it should have been discovered and unless the objecting party has been specially injured or prejudiced thereby."

objects to it 'as soon as possible after its discovery or after it should have been discovered and unless [he] has been specially injured or prejudiced thereby.'" <u>Commonwealth</u> v. <u>Vuthy Seng</u>, 456 Mass. 490, 495 (2010), quoting from G. L. c. 234A, § 74.  See <u>Commonwealth</u> v. <u>Mora</u>, 82 Mass. App. Ct. 575, 578-579 (2012).  The defendant did not object to the excusal of any student and has not substantiated any prejudice beyond the general hypothesis of his loss of the students' special online savvy.

If timely objection had preserved the merits, the record would not show a violation of G. L. c. 234A, § 3.  The judge did not confer a categorical exemption on students.  She instead identified full-time student status as an available, but not automatic, ground of hardship and excusal.  The initiative remained with the student.  Of the nineteen excusals, fifteen students brought their hardship status to the judge's attention by raising their juror identification cards.  The judge's respect for their requests was reasonable.  The defendant has not argued that a one-to-two-week absence from classes would not qualify as a hardship.

<u>Judgments affirmed</u>.