NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-105

COMMONWEALTH

vs.

JUAN ALMODOVAR.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a jury trial in the Superior Court, the defendant, Juan Almodovar, was convicted of two counts of rape of a child, aggravated by age difference, G. L. c. 265, § 23A (b); incest, G. L. c. 272, § 17; and two counts of indecent assault and battery on a person fourteen or over, G. L. c. 265, § 13H.  On appeal, he contends that the trial judge erred by (1) allowing the victim's unexpected testimony about an unindicted prior bad act; (2) admitting Facebook messages in evidence without sufficient authentication; and (3) admitting the victim's medical records in evidence.  We affirm.

Background.  The victim is the defendant's younger half-sister.  They share the same mother, but the defendant is

roughly twenty years older than the victim.  The victim was seventeen years old at the time of the defendant's trial.

The victim and the defendant had a close relationship as she was growing up.  In early 2015, the victim was fourteen years old, and the defendant was thirty-three.  At that time, the defendant lived with his wife and children in a different part of town, but he frequently visited the victim at the home she shared with their mother; he often spent the night.  The victim testified that she saw the defendant at least once a week in 2015, and that they sent text messages to each other more often than that.  Specifically, the parties communicated via the Facebook Messenger app.  She often went to him for advice, and she looked up to him as a sort of father figure.

On April 13, 2015, the victim stayed home from school with the flu.  The victim's other siblings had gone to school, and her parents left the house in the late morning to go grocery shopping.  Her uncle, who was living with her family at the time, was in the basement.  The defendant was sitting with the victim while she caught up on schoolwork in the kitchen.  After a while, the defendant kissed the victim on the lips and told her, "That's how you kiss a real man."  The victim was shocked by this, and she didn't say anything.  The defendant then led the victim upstairs to her bedroom where she ended up lying on her back on a mattress on the floor.  The defendant proceeded to

vaginally rape the victim while she lay there crying. Afterwards, the defendant said "Round one is done," pulled up his pants, and left the room.

At first, the victim did not tell her parents about the assault. Instead, the victim told a trusted adult at her church, who said she would call the police. The victim asked her not to do that and said that she would "handle it [her]self." The victim returned to school the next day, and her mother came to pick her up at the end of the day. The victim believed that her mother would not support her if she accused her brother of assault. Therefore, in order to avoid tension in her family, she decided not to report it to the police.

A few days after the assault, on April 16th, the victim sent the defendant a Facebook message around 9 A.M. saying, "I dont think we can do this anymore." The victim testified that this message was referring to "what [the defendant] did to [her]." The defendant responded, "Ok are you okay" and the victim replied, "Yea im fine thx." The defendant then wrote, "I hope you don't be different with me" and "I Don't want to lose my sister." Later in the day, the defendant messaged the victim again and said "What happened what is that I did" and "Mommy just called me and told me something crazy." He continued messaging the victim, stating that he was being accused of something and asking her what was going on.

3

After school that day, an investigator from the Department of Children and Families (DCF) came to the victim's home to respond to an allegation of abuse. The victim's mother was uncooperative during this visit, screaming at the investigator and the police who accompanied her, and initially refusing to let them into the house. The victim testified that her mother's refusal to cooperate with the DCF investigator reinforced the victim's decision not to pursue the case.

That night, around 11 P.M., the victim replied to the defendant on Facebook Messenger and said, "The thing is goin good so far cause i said nothn happened and we all said nothn . . . and so all that is left is tomorrow exam, and she said I do[n't] have to do the full part thing . . . ." The victim later testified that she was referring to a sexual assault examination. The defendant replied, "Thank you I'm sorry for being such a piece of shit I'll never do anything like that again" and "I love you sis thank you I can't say it enough."

The next day, the victim went to the hospital for a sexual assault examination. The victim was accompanied by her mother and her cousin. A DCF investigator met them at the hospital. Prior to the hospital visit, the victim had already spoken to her mother and decided that she was not going to cooperate with the sexual assault examination. At the hospital, the victim's mother yelled, made threats, and refused to give consent for the

4

victim to be examined. Security had to remove her from the premises. Eventually, the victim went into an examination room and saw a doctor, alone.

The victim did not allow the doctor to conduct a sexual assault examination. That afternoon, the defendant messaged the victim to ask, "How everything went," and "Did you take the test[?]" She replied "Nah i didnt have to." After the hospital visit, the victim told her family that she had been lying about the assault. As a result, "there wasn't as much tension" in her home. Her mother was "more at ease" and "everything was calm." Roughly a year later, in 2016, the victim's foster mother took her to the hospital. At that visit, she allowed a doctor to complete a physical examination but refused a genital examination due to anxiety.

At the defendant's trial, the victim unexpectedly testified to unindicted conduct while describing the assault. The prosecutor asked "So then what happened next?" The victim testified that the defendant "flipped me over and put his penis into my butt." Defense counsel immediately objected to this testimony. After a brief sidebar,[1] the trial judge instructed

---

[1] Although the victim had initially disclosed an anal rape, she had not testified to being anally raped in the grand jury proceeding, and so the Commonwealth had not pursued an indictment for that conduct.

5

the jury: "Ladies and gentlemen, that last bit of testimony regarding the penis in the anus is not charged conduct in this case. It's not for you to consider. It's not indicted. So the testimony will stand, but it's not to be considered, all right? Thank you." The defendant did not object to that instruction. During his final instructions, the judge reiterated that any testimony that he told the jury to disregard is "not evidence."

Discussion. 1. Curative instruction. The defendant asserts that the judge improperly allowed the victim to give inadmissible bad act testimony that the defendant "put his penis into [her] butt." In fact, the victim's testimony to that effect was an unexpected answer to the prosecutor's question, "what happened next?" In short, the judge did not allow the testimony. Trial counsel objected, and the judge responded swiftly, instructing the jury not "to consider" the victim's "testimony regarding the penis in the anus."

The defendant also argues that this instruction did not cure the error because it was internally inconsistent. The defendant did not object to the instruction at trial. Accordingly, we review for a substantial risk of a miscarriage of justice. See Commonwealth v. Beaudry, 445 Mass. 577, 587 (2005) (while objection generally preserves right of appeal, when objection is followed by curative instruction and defendant does not object to instruction, any error is reviewed for

6

substantial risk of miscarriage of justice). This standard "requires us to determine if we have a serious doubt whether the result of the trial might have been different had the error not been made" (quotation and citation omitted). Commonwealth v. Azar, 435 Mass. 675, 687 (2002).

"[I]n response to the jury's exposure to inadmissible evidence, the judge may correctly rel[y] on curative instructions as an adequate means to correct any error and to remedy any prejudice to the defendant" (quotation and citation omitted). Commonwealth v. Torres, 86 Mass. App. Ct. 272, 280 (2014). Jurors are presumed to have followed a judge's instruction to disregard evidence. See Commonwealth v. Durand, 475 Mass. 657, 669 (2016). "Generally, provided the instructions are reasonably prompt and the jury do not hear the inadmissible evidence again, the error will be considered cured." Commonwealth v. Roe, 90 Mass. App. Ct. 801, 804 (2016).

Here, although the judge's instruction deviated from the standard instruction, it prevented a substantial risk of a miscarriage of justice. Immediately after the victim gave the inadmissible testimony, the judge instructed the jury not "to consider" it. He then stated that the testimony "will stand," but reiterated that it was "not to be considered." The prosecutor did not elicit any more testimony about the uncharged conduct, and the judge explained during his final instructions

7

that anything he told the jury to disregard is "not evidence."
Given the strength of the Commonwealth's case, the fact that the
improper testimony was very brief, and that the judge
immediately reacted to the improper testimony by instructing the
jury, twice, not to consider it, neither the improper testimony
nor the judge's statement that it would "stand" created a
substantial risk of a miscarriage of justice.  See Beaudry, 445
Mass. at 588.

2.  Message authentication.  Next, the defendant argues
that the April 2015 Facebook messages were not sufficiently
authenticated and thus, the judge erroneously admitted them.[2]  We
review a judge's evidentiary ruling for abuse of discretion, and
will affirm it unless the judge made a clear error of judgment
"such that the decision falls outside the range of reasonable
alternatives."  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27
(2014).

"The requirement of authentication . . . as a condition
precedent to admissibility is satisfied by evidence sufficient
to support a finding that the matter in question is what its
proponent claims."  Commonwealth v. Purdy, 459 Mass. 442, 447

_____

[2] The judge denied the defendant's motion in limine to
exclude these messages on authentication grounds.  He did,
however, allow the defendant's motion in limine to exclude
another batch of Facebook messages from June 2015, finding them
more prejudicial than probative.

8

(2011), quoting Mass. G. Evid. § 901(a) (2011). "[B]ecause the relevance and admissibility of the communications depended on their being authored by the defendant, the judge was required to determine whether the evidence was sufficient for a reasonable jury to find by a preponderance of the evidence that the defendant authored the [messages]." Purdy, supra. There is no requirement that there be direct evidence that a digital communication was sent by the defendant; a judge may "look to 'confirming circumstances,'" such as a message's specific content, personal references, or familiar tone, to make such a ruling. Id. at 449. See Commonwealth v. Gilman, 89 Mass. App. Ct. 752, 758-759 (2016); Commonwealth v. Oppenheim, 86 Mass. App. Ct. 359, 368 (2014).

Here, as in Purdy, 459 Mass. at 458, there was no direct evidence that the defendant authored the Facebook messages. And the fact that the messages originated from "a social networking Web site such as Facebook . . . that bears the defendant's name is not sufficient alone to authenticate the electronic communication as having been authored or sent by the defendant." Id. at 450. Still, in this case, there were "adequate 'confirming circumstances'" to meet the threshold for authentication. Id. The specific content and tone of the messages was sufficient to support a reasonable conclusion that the defendant authored the messages. The messages reflect the

9

sender's personal knowledge of the details and timing of the victim's conversations with her mother about the assault, the April 16th DCF home visit, and the April 17th hospital visit. The sender also calls the victim "my sister," and "sis," and references their shared "mommy" throughout the conversation. The use of those nicknames and the familiar tone further support a finding that the defendant authored the messages. See Gilman, 89 Mass. App. Ct. at 759; Oppenheim, 86 Mass. App. Ct. at 368. Thus, we find no abuse of discretion in the trial judge's decision to admit these messages in evidence.

3. Medical records. At trial, the defendant argued that the victim's medical records were inadmissible because they were irrelevant, prejudicial, and cumulative. On appeal, the defendant raises the same evidentiary objections but adds that the medical records could have confused or inflamed the passion of the jury. We review preserved objections for prejudicial error and consider "whether there is a reasonable possibility that the error might have contributed to the jury's verdict." Commonwealth v. Carriere, 470 Mass. 1, 7 (2014), quoting Commonwealth v. Alphas, 430 Mass. 8, 23 (1999). We review unpreserved evidentiary objections for a substantial risk of miscarriage of justice. See Commonwealth v. Wright, 411 Mass. 678, 681 (1992).

10

"Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence and (b) the fact is of consequence in determining the action." Mass. G. Evid. § 401 (2025). "Evidence of a victim's state of mind or behavior following a crime has long been admissible if relevant to a contested issue in a case." Commonwealth v. Arana, 453 Mass. 214, 225 (2009). The Commonwealth introduced the medical records to rebut the defendant's arguments that (1) the victim's recantation proved she was lying about the assault; and (2) the lack of physical evidence of the rape supported his defense of fabrication. Here, the medical records were relevant to the central issue in the case, the victim's credibility. See id.

Furthermore, the records were not unfairly prejudicial to the defendant. They documented the victim's first refusal of an examination and her subsequent agreement to a partial examination. Moreover, the parties agreed to redactions and the records themselves were not graphic or inflammatory. "The weighing of probative value versus prejudicial effect of evidence in the context of a trial is an issue left particularly to the discretion of the trial judge." Commonwealth v. Rosa, 468 Mass. 231, 242 (2014). That determination is "not disturbed absent palpable error." Commonwealth v. Spencer, 465 Mass. 32,

48 (2013), quoting Commonwealth v. Sylvia, 456 Mass. 182, 192 (2010). We see no such error here.

Finally, the records were not cumulative because the DCF social worker testified only briefly about the hospital visit and did not personally witness the entire interaction between the victim's family and hospital staff. We see no error in the judge's decision to admit these records as evidence to demonstrate the victim's family dynamics to explain her recantation and delayed reporting of the crime.

Finally, we consider the defendant's new argument on appeal that the records could have confused or inflamed the passions of the jury. Again, because the records were not graphic or inflammatory, we see no risk that the jury's passions would have been inflamed. And we disagree that the records, which were directly relevant to the victim's credibility, could have confused or distracted the jury. See Commonwealth v. Silva, 482 Mass. 275, 290 (2019) ("The jury are presumed to follow all instructions they are given"). We conclude that the judge's

12

decision to admit medical records was not in error and did not create a substantial risk of a miscarriage of justice.

Judgments affirmed.

By the Court (Singh, Hershfang & Wood, JJ.[3]),

Clerk

Entered:  April 16, 2026.

---

[3] The panelists are listed in order of seniority.