NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-423                                     Appeals Court

COMMONWEALTH  vs.  DAVID GILMAN.

No. 15-P-423.

Worcester.      May 6, 2016. - July 21, 2016.

Present:  Cohen, Green, & Neyman, JJ.


Rape.  Indecent Assault and Battery.  Evidence, Relevancy and
    materiality, Inflammatory evidence, Authentication, Best
    and secondary.  Constitutional Law, Assistance of counsel.
    Practice, Criminal, Assistance of counsel, Argument by
    prosecutor, Voir dire, Jury and jurors.  Jury and Jurors.



    Indictments found and returned in the Superior Court
Department on April 23, 2010.

    The cases were tried before Peter B. Krupp, J.


    Diana Cowhey McDermott for the defendant.
    Michelle R. King, Assistant District Attorney, for the
Commonwealth.


    GREEN, J.  A Superior Court jury convicted the defendant, a

middle school music teacher, of rape and three counts of

indecent assault and battery on a child under fourteen,

aggravated in the first instance by age difference and in all

instances by reason of the defendant's status as a mandated reporter.  On appeal, he claims error in the admission of a number of "chat" messages he exchanged with the victim (a twelve year old student of his at the time of the assaults) on the social networking Web site Facebook.  He also claims that he was deprived of his constitutional right to effective representation by counsel when his counsel promised the jury that the defendant would testify at trial, but then broke that promise when the defendant did not testify after the Commonwealth rested.  We discern no cause to disturb the convictions, and affirm.[1]

Background.  We summarize the facts the jury could have found, viewed in a light most favorable to the Commonwealth.  See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).  In the fall of 2008, the victim was a sixth grader at Leicester Middle School; the defendant was her music teacher.  At the end of her sixth grade year, the victim went on a school-sponsored camping field trip.  The defendant was a chaperone on that field trip, and he and the victim spent a lot of time together while on the trip.  At the end of the trip, the defendant put his cellular telephone (cell phone) number and his name into the

---

[1] As discussed infra, the defendant also claims that the prosecutor misstated the evidence during closing argument, and he assigns error to the failure of the trial judge to conduct individual voir dire of prospective jurors on the topic of childhood victimization and sexual assaults.  Neither claim warrants relief.

victim's cell phone contact list, and they exchanged text messages frequently thereafter. Over the course of the following summer, which included another school-sponsored trip to the Six Flags New England amusement park in which the defendant and the victim participated, their correspondence continued, and they eventually became "friends" on Facebook. The defendant and the victim began a continuing Facebook "chat" conversation around October of 2009, when the victim was a seventh grader and the defendant was her music teacher and drama club director.

When the defendant or the victim wanted to "chat" with each other on Facebook, they would alert the other by sending a text message. The victim knew that her Facebook conversation was with the defendant because they discussed things that they had done in person, and things that were known only to them. The defendant and the victim chatted "a lot of time at night," on topics ranging from the drama club, their time together on the previous summer's school trips, and their developing affection for each other.[2]

---

[2] The following exchange is illustrative of their chats during this period:

Defendant: "Anyway, the day at Six Flags when I held your hand on the way in."
Victim: "Really?"
Defendant: "Remember?"
Victim: "Yeah."

During the course of the Facebook conversations, the defendant and the victim frequently professed their love for each other. On October 25, 2009, they talked about kissing each other:

> Defendant: "When I kiss u it will mean everything 2 me."
> Victim: (She replied with a smiley face).
> Defendant: "Kiss me back please?"
> Victim: "Yes."
> Defendant: "I will luv u 4ever!!! Will u kiss me back bcuz u luv me or just bcuz."
> Victim: "Because I love u."
> Defendant: "My girl."

On October 30, 2009, the victim attended a school dance with two of her friends. Halfway through the dance, the victim received a text message from the defendant asking her to meet him in the hallway. The victim went into the hallway, where she met the defendant and followed him into the music room. In the music room, they moved to an area where the victim could not see the hallway. The defendant then touched the victim's hips, and proceeded to kiss her on the mouth; his lips and tongue touched her lips and tongue. The defendant and the victim stayed in the music room for about five to ten minutes, and the victim then

---

> Defendant: "And then you wrecked me completely on the bus ride home. I did nothing but think about you all [s]ummer."
> Victim: "That was a fun bus ride home. I got to beat the hell out of Tom, and bug the hell out of you."
> Defendant: "Yeah. And you used all your super flirt powers on me."
> Victim: "And I got you."
> Defendant: "Hook, line and sinker, as they say. Now I couldn't stop thinking about you if I tried."

returned to the gymnasium.  Later that evening, the defendant and the victim chatted about their kiss on Facebook.

During this time period, the defendant frequently reminded the victim to delete or clear her messages, and became concerned when the victim told him that one of her friends saw messages from him.  When the victim tried to reassure the defendant he stated, "Damn, . . . I love you so much, and I will lose my job, my life, and I will go to jail."  Despite acknowledging that "[w]e already broke the law," the defendant continued to engage the victim in sexual conversation, and eventually talked about what he wanted to do to her sexually.[3]

At some point after Thanksgiving, the defendant and the victim made a plan to meet alone in the band room at the school. After her last class, the victim went into the band room as planned.  Once in the band room, the victim went immediately to the defendant.  He did not say anything to her, but grabbed her hips with his hands and kissed her on her mouth with his lips and tongue.  The defendant also touched the victim's breast with his hand.  The defendant and the victim continued to communicate

---

[3] The defendant said he would "slide my finger inside of your pussy and feel you from the inside," and "push my finger in and out of you until you cum."  The defendant then said he could "use my tongue or my cock," and "I will slide my cock up and down the outside of your pussy . . . I will make you so wet." Because the victim did not understand what the defendant meant by the word "wet" she had to look it up online using the Urban Dictionary Web site.

via Facebook and frequently talked about future sexual activity and what the defendant would like to do to the victim.[4]

When the defendant and the victim chatted on Facebook on December 1, 2009, the victim said that one of her friends at school noticed that he looked like he had been crying. The defendant stated that he fell asleep on the computer and his wife came down to get him and saw the conversations he had with the victim, and she was "pretty pissed off this morning." The victim was concerned for the defendant and stated, "I do love you and don't want anything to happen to you," and "It's you I'm worried about. I love you so much. We have to stop before we do get caught and then you will go to jail."

The last time the victim saw the defendant before he was arrested, they were alone again in the band room. On that day the defendant put his hand underneath her clothes, and put his hand "in between the lips of [her] vagina." In doing so, the defendant moved his finger "up and down between the lips of

---

[4] The defendant talked about wanting to make the victim "hot and wet and crazy," and stated that he would like to "take turns rubbing the outside of you and putting myself inside of you." The defendant expressed guilt to the victim over "making you grow up so fast," and stated, "I hate how I'm putting ideas in your head you would never have had." Nevertheless, the defendant continued to educate the victim sexually, at one point asking, "What does it mean to give me head or a blow job?" When the victim replied that it meant to "suck a guy's cock" but could not describe what she would do to him sexually, the defendant replied, "boring." In response, the victim said, "I'm twelve. How am I supposed to know?"

[her] vagina."  The defendant sexually assaulted the victim for approximately one to two minutes.  She then backed away, and went to homeroom.

On December 16, 2009, Julia Berry of the Leicester police department went to Leicester Middle School, where she met with the defendant in the principal's office.  The defendant had a backpack with him, and Officer Berry asked him if he had a laptop computer.  The defendant replied, "Well, it belongs to the school."  The defendant put the laptop computer down in the corner of the office and left.  Daniel Durgin, the technology director at Leicester public schools in 2009, issued the defendant one desktop computer and two laptop computers in the 2009 academic year.  When Durgin issued a computer to a teacher, he would do a fresh installation of software, and would assign a user name and password that was specific to the teacher assigned the computer.[5]  After the computer was issued to a particular teacher, the teacher could then change the password, and no person other than that teacher or Durgin could access that computer.  The school's Internet use policy prohibited access to Facebook from the school.  However, teachers were permitted to take the computers home and could access Facebook when away from the school's network.

---

[5] The defendant's user name was "gilmand."

Durgin did not access the defendant's profile on any of the defendant's computers in the fall of 2009, nor did he use any of the computers to access any Internet sites or locations. After the defendant's computers were seized on December 16, 2009, all of the defendant's accounts were locked, and the computers remained in Durgin's locked office. Troopers Carl Oley and Kevin Hart from the State police digital evidence and multimedia section examined the computers and cell phone that were submitted to them. When Trooper Hart analyzed the victim's computer, he located 1,712 Facebook chat logs. When Trooper Hart performed the same analysis on one of the laptop computers with the user name "gilmand," he found over 3,000 Facebook chat logs. When he analyzed a second laptop computer with the user name "gilmand," he also found over 3,000 Facebook chat logs. Trooper Hart exported the Facebook chat logs into a spreadsheet.

Christine Bugbee, another teacher at the school and a friend of the defendant's, saw the defendant shortly after he was dismissed from the school. She asked him, "Did you do it?" The defendant replied, "No, but it will look like I did."

Discussion. 1. Admissibility of Facebook chat logs. Prior to trial, the defendant moved in limine to exclude the Facebook chat messages between the defendant and the victim on the grounds that they: (i) were irrelevant and inflammatory,

(ii) describe inadmissible prior bad acts, (iii) were not the best evidence, and (iv) could not be authenticated properly.[6]

"Evidence of a defendant's prior or subsequent bad acts is inadmissible for the purpose of demonstrating the defendant's bad character or propensity to commit the crime[s] charged." Commonwealth v. Crayton, 470 Mass. 228, 249 (2014). "However, such evidence may be admissible . . . 'to establish motive, opportunity, intent, preparation, plan, knowledge, identity, or pattern of operation.'" Ibid., quoting from Commonwealth v. Walker, 460 Mass. 590, 613 (2011). "Even if the evidence is relevant to one of these other purposes, the evidence will not be admitted if its probative value is outweighed by the risk of unfair prejudice to the defendant." Crayton, supra at 249 & n.27.

The content of the Facebook chat conversations between the victim and the defendant was clearly relevant. They contained numerous declarations of love by the defendant and the victim

---

[6] For the first time on appeal, the defendant also contends that they constitute inadmissible hearsay. The claim is waived. See Commonwealth v. Brinson, 440 Mass. 609, 611 (2003). In any event, the statements of the defendant are admissible as admissions of a party opponent. See Commonwealth v. Cutts, 444 Mass. 821, 834 (2005). The statements by the victim in the chat conversations principally furnished context for the defendant's statements and were not offered for their truth (though, as the defendant did not object or request a limiting instruction, none was given). In any event, the victim's statements in the chats were largely cumulative of the victim's testimony at trial and, accordingly, pose no substantial risk of a miscarriage of justice.

toward each other, and described various of their encounters, including those occasions on which the defendant assaulted the victim.  The conversations illustrate how the defendant cultivated the victim's feelings toward him, educated her about various forms of sexual interaction, and manipulated her insecurities to cause her to fear the loss of his affections. In several instances, the defendant's admissions corroborated the victim's trial testimony describing both the circumstances and the nature of the defendant's assaultive conduct.  Though the lurid nature of the conversations undoubtedly caused prejudice to the defendant, the prejudice flowed directly from their properly probative effect to illustrate the development of the relationship between the defendant and the victim, its increasingly sexually charged character, and their shared reflection on several sexual encounters.  The prejudice, in other words, was not unfair.  See Commonwealth v. Kindell, 84 Mass. App. Ct. 183, 188 (2013).  We discern no abuse of discretion by the trial judge in his conclusion that the probative value of the Facebook chat evidence outweighed its potential for unfair prejudice.

We likewise discern no error or abuse of discretion in the conclusion by the trial judge that the Facebook chat conversations were properly authenticated.  "To satisfy the requirement of authenticating or identifying an item of

evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Mass. G. Evid. § 901(a) (2016).  "Here, because the relevance and admissibility of the communications depended on their being authored by the defendant, the judge was required to determine . . . by a preponderance of the evidence that the defendant authored the [Facebook chat messages attributed to him]."  Commonwealth v. Purdy, 459 Mass. 442, 447 (2011).  "Evidence may be authenticated by direct or circumstantial evidence, including its '[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics.'"  Id. at 447-448, quoting from Mass. G. Evid. § 901(b)(1), (4).  "While [electronic mail messages (e-mails)] and other forms of electronic communication present their own opportunities for false claims of authorship, the basic principles of authentication are the same" as for telephone calls or written letters.  Id. at 450.  "Evidence that the defendant's name is written as the author of an e-mail or that the electronic communication originates from an e-mail or a social networking Web site such as Facebook or MySpace that bears the defendant's name is not sufficient alone to authenticate the electronic communication as having been authored or sent by the defendant."  Ibid.  "There must be some 'confirming circumstances' sufficient

for a reasonable jury to find by a preponderance of the evidence that the defendant authored" the messages.  Ibid.

In the present case, there were sufficient confirming circumstances to establish that the defendant authored the Facebook chat messages attributed to him.  The messages originated from an account bearing the defendant's name, on which his picture appeared.  The messages were downloaded from the hard drive of two laptop computers issued to the defendant by the school, but to which access was limited to the defendant by means of a user name and password.[7]  There was no evidence of access to the defendant's laptop computer by others.  The defendant and the victim initiated Facebook chat conversations with each other by means of text messages sent to each other's cell phones; in the case of such messages sent by the victim to the defendant, they were sent to the number the defendant added to her contacts list after the first school field trip the two took together.

In addition, the conversations were replete with personal references, including pet names the defendant and victim used for each other, and references to events in which the two alone

---

[7] As explained by the Commonwealth's digital forensic expert, State Trooper Kevin Hart, the messages were stored in the Internet cache of the computer hard drive, as temporary files downloaded from the Facebook server (or other Web pages) visited by the computer user during a browsing session.

participated.  The evidence amply supported a conclusion that the defendant authored the Facebook chat messages.[8]

Finally, we discern no merit in the defendant's contention that the printed spreadsheets of the Facebook chat conversations did not satisfy the "best evidence" rule.  "The best evidence rule does not forbid the use of 'copies' of electronic records (including e-mails and text messages and other computer data files), because there is no 'original' in the traditional sense."  Commonwealth v. Salyer, 84 Mass. App. Ct. 346, 356 n.10 (2013).  Moreover, G. L. c. 233, § 79K, inserted by St. 1994, c. 168, § 1, permits the admission of a duplicate "computer data file or program file."  We reject the premise implicit in the defendant's argument that the best evidence of the writings contained in the Facebook chat conversations between the defendant and the victim "somehow . . . is found in the [Facebook] servers" or that there is a "need to bring in the computer [hard] drive itself" from which the messages were

---

[8] Though the trial judge should have instructed the jury that they were required to find by a preponderance of the evidence that the defendant authored the Facebook chat messages, see Commonwealth v. Foster F., 86 Mass. App. Ct. 734, 737-738 (2014), the defendant neither requested such an instruction nor objected to the instructions administered by the trial judge. In light of the abundance of evidence that the defendant authored the messages attributed to him, we discern no substantial risk of a miscarriage of justice by reason of the omission.

downloaded.  Commonwealth v. Amaral, 78 Mass. App. Ct. 671, 674-675 (2011).[9]

2.  Ineffective assistance of counsel.  Citing his trial counsel's opening statement, the defendant claims that he was deprived of his constitutional right to the effective assistance of counsel.  Specifically, he observes that his trial counsel promised the jury that the defendant would testify at trial, but then broke that promise when the defendant did not testify after the Commonwealth rested its case.[10]  The defendant did not raise

---

[9] We recognize that by virtue of the manner in which the conversations were retrieved, downloaded from the "Internet cache" folders on the hard drives of the computers used by the victim and defendant, the conversations were incomplete in some respects, in the sense that there were gaps in some conversations.  However, that does not make the files that were retrieved any less accurate or reliable as copies of the portions of the conversations they reflected.  The defendant makes no claim that so much of the conversations as were admitted were misleading or unintelligible by reason of any such gaps, so as to implicate the doctrine of verbal completeness.  See Commonwealth v. Watson, 377 Mass. 814, 825-831 (1979).  In any event, the defendant made no request to supply additional portions of the conversations to fill in any such gaps.

[10] Counsel stated as follows:

"There's another sort of bedrock cornerstone of our judicial system, if you will, and that's the right to remain silent.  You may have heard this term before in movies and TV shows and so forth.  It's a right to remain silent.  And what it says, it's a principle of law that says the defendant, an individual who is charged with a crime, has no obligation to say anything.  That person can remain silent.  He can say to the government, 'Prove your case beyond a reasonable doubt.  I'm going to remain silent and say nothing.  It's on you to prove the case.'  That's an absolute constitutional right.  It's the Fifth

his claim of ineffective assistance of counsel by means of the preferred vehicle of a motion for a new trial. See Commonwealth v. Zinser, 446 Mass. 807, 810-811 (2006). "While we could speculate about defense counsel's rationale for proceeding the way he did, the proper mechanism for advancing the defendant's ineffective assistance claim is through a motion for a new trial, which provides the opportunity for an evidentiary hearing and findings related to the trial attorney's performance." Commonwealth v. Ramos, 66 Mass. App. Ct. 548, 552 (2006). "The occasions when a court can resolve an ineffective assistance claim on direct appeal are exceptional, and our case law strongly disfavors raising ineffective assistance claims on direct appeal." Zinser, supra at 809 n.2. Such claims are properly considered on direct appeal only "when the factual basis of the claim appears indisputably on the trial record." Id. at 811, quoting from Commonwealth v. Adamides, 37 Mass. App. Ct. 339, 344 (1994). This is not such a case. Though the record includes trial counsel's explanation to the jury of the

Amendment. You've probably heard the term, 'I plead the Fifth.' And it's important in this case, because the government, the court, cannot make Mr. Gilman get on that witness stand and testify. They can't force it. But I'm going to tell you a secret. He's going to get on that witness stand. He's going to waive that Fifth Amendment privilege. He is going to waive that constitutional right to remain silent. He's going to take the witness stand and he's going to testify and he's going to tell you his version of events, if you will, and his version of events are [sic] different than her version of events."

change of plans at the beginning of his closing argument,[11] we have no means of knowing whether that explanation is either complete or accurate, nor have we any basis other than speculation to assess what led counsel to frame his opening statement as he did.  We conclude that the present case does not fall within the narrow exception for cases in which a claim of ineffective assistance of counsel may be resolved on the basis of the trial record alone.

3.  Other issues.  The defendant's remaining claims require only brief discussion.  First, there is no merit to the

---

[11] Trial counsel began his closing argument as follows:

"Good morning, ladies and gentlemen.  In my opening to you a few days ago I talked about this Fifth Amendment right not to testify, it is an absolute constitutional guarantee.  And then I went on to tell you that I expected, fully, Mr. Gilman to take the witness stand and testify.  That was before I knew what the testimony for sure was going to be from the Commonwealth witnesses.  I didn't know, for example, that [the victim] was going to tell you that she lied to the grand jury and that she lied to you under oath.

"I didn't expect, for example, that Ms. Bugbee, or Mrs. Bugbee, the friend of Mr. Gilman who testified, would talk about this statement that he gave to her when this all came out and he was relieved of his duties at the school, this statement where she asked him, "Did you do this?  Did you touch her," and he said, "No, but it would appear from what I wrote that I did."

"These things are our arguments.  They are our defense, if you will.  They came out through the testimony of the other witnesses.  And a legal decision was made not to call Mr. Gilman to the witness stand; a legal decision was made."

defendant's contention that the trial prosecutor misstated the evidence in her closing and suggested that the defendant had identified his next victim, a classmate of the victim's.[12]  Read in context, the reference plainly was designed to suggest that the defendant sought to play on the victim's insecurities and jealousy to keep her close to him, and did not suggest that the defendant had designs on a second victim.  Though the defendant did not use the precise words attributed to him by the prosecutor, the evidence included a chat conversation in which the victim revealed her concern that the defendant would leave her for the classmate, and from which the jury could infer that the defendant's response sought to exploit that insecurity.  Moreover, despite objecting to the comment trial counsel expressly declined the judge's offer of a curative instruction.  Finally, the comment went to a collateral issue -- the defendant's manipulation of the victim -- and not to the question whether he actually engaged in the sexual conduct described in his Facebook chats with the victim.

---

[12] The prosecutor commented,

> "When he talks about manipulation, he tells her, 'I've been a teacher for a long time.  I've been a teacher for a long time and I've never felt this way about any other student.  But [the classmate], she's coming close.' Manipulation.  The push.  The pull.  Draw her in and push her back out."

There is likewise no merit in the defendant's claim that the trial judge erred in his failure to conduct individual voir dire questioning of prospective jurors to determine whether they had been victims of a childhood sexual offense. Prior to empanelment, the trial judge reviewed with both counsel the questions he intended to pose to members of the venire, including, "Have you or any family members or close friends ever been the victim of sexual abuse?" The judge then proposed to pose the questions by means of a juror questionnaire, and to examine jurors who responded "yes" individually, out of order. Trial counsel expressed his satisfaction with that approach. However, after a few jurors had been called forward for such individual questioning, both the prosecutor and defense counsel objected, and the judge agreed (again with the approval of counsel) to conduct review of all jurors in order, with individual voir dire on those with affirmative answers to the question as they were reached. Because the trial judge properly exercised his discretion by conducting juror voir dire in the manner to which both counsel agreed, and because the defendant has failed to demonstrate that the agreed upon procedure either constituted an abuse of discretion or exposed jurors to influence by any extraneous factors, we discern no error and, accordingly, no substantial risk of a miscarriage of justice.

See <u>Commonwealth</u> v. <u>Lao</u>, 443 Mass. 770, 778 (2005); <u>Commonwealth</u> v. <u>Vickery</u>, 82 Mass. App. Ct. 234, 237 (2012).

<u>Judgments affirmed</u>.