After a trial in the District Court, a jury found the defendant, James M. Bowen, guilty of one count of violating an abuse prevention order, three counts of threatening to commit a crime, and one count of making annoying telephone or electronic communications. On appeal, he challenges the convictions of violating the abuse prevention order and the two counts of threats in which his ex-wife was the target on the ground that the evidence was insufficient to show that he contacted or intended for his threats to be communicated to her. He also contends that text messages and Facebook posts were erroneously admitted in evidence without proper authentication. We affirm.
Discussion. 1. Sufficiency of the evidence. Noting that he never directly contacted his ex-wife, and that the threats to rape and murder her were contained in text messages sent to her boy friend, Michael Aikey, the defendant contends on appeal, as he did in his motion for required findings of not guilty at the close of the Commonwealth's case, that the evidence was insufficient to prove that he violated the no-contact order or that he intended for his threats to rape and murder his ex-wife to be communicated to her.[2]
"When reviewing the denial of a motion for a required finding of not guilty, 'we consider the evidence introduced at trial in the light most favorable to the Commonwealth, and determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " Commonwealth v. Ross, 92 Mass. App. Ct. 377, 378 (2017), quoting from Commonwealth v. Oberle, 476 Mass. 539, 547 (2017). "The inferences that support a conviction 'need only be reasonable and possible; [they] need not be necessary or inescapable.' " Commonwealth v. Waller, 90 Mass. App. Ct. 295, 303 (2016), quoting from Commonwealth v. Woods, 466 Mass. 707, 713, cert. denied, 134 S.Ct. 2855 (2014).
"The elements of threatening a crime [under G. L. c. 275, § 2,] include an expression of intention to inflict a crime on another and an ability to do so in circumstances that would justify apprehension on the part of the recipient of the threat." Commonwealth v. Robicheau, 421 Mass. 176, 183 (1995). "[A] threat may be communicated to an intended target by way of a third-party intermediary, but only where it is shown that the defendant intended the threat to reach the target." Commonwealth v. Hamilton, 459 Mass. 422, 427 (2011). See Commonwealth v. Troy T., 54 Mass. App. Ct. 520, 526 (2002). The defendant's intent "need not be express" and may be proved by circumstantial evidence. Commonwealth v. Meier, 56 Mass. App. Ct. 278, 282 (2002). "Thus, when a defendant utters a threat to a third party who 'would likely communicate it to [the ultimate target],' the defendant's act constitutes evidence of [his] intent to communicate the threat to the intended victim." Ibid., quoting from Troy T., supra at 527.
Similarly, for purposes of a G. L. c. 209A no-contact order, contact with a protected party includes communication through another. See Commonwealth v. Butler, 40 Mass. App. Ct. 906, 907 (1996) ; Commonwealth v. Russell, 46 Mass. App. Ct. 307, 310 (1999). "[O]ne cannot undermine a no contact order by the simple expedient of ricocheting prohibited comments off of third parties ... who are in the vicinity of those whom the order protects." Commonwealth v. Consoli, 58 Mass. App. Ct. 734, 741 (2003).
Viewing the evidence in the light most favorable to the Commonwealth, a rational jury could have inferred that the defendant communicated the threats against the victim to Aikey with the knowledge and intent that they would be conveyed to her.
The defendant's first contact with Aikey, in which the defendant gave Aikey his telephone number and invited Aikey to contact him in the event of an emergency concerning the children of the defendant and the victim, supports the inference that the defendant expected Aikey to act as an intermediary between the defendant and the victim. Indeed, the conversation between Aikey and the defendant that preceded the defendant's threats concerned the defendant's apparent intent to move to Florida and to abandon the children. See Commonwealth v. Hughes, 59 Mass. App. Ct. 280, 283 (2003) (jury could infer that defendant's threatening language communicated to his brother would reach the intended victim where brother "had played the role of intermediary" between defendant and victim).
The defendant also knew that Aikey and the victim were involved in a romantic relationship. Indeed, in one of the texts to Aikey, the defendant suggested that he knew he would find Aikey at the victim's house: "I have [the victim's address] in the GPS. You're the only reason I'm coming back. P.S. I'm gonna murder you. Have a good night." The jury could infer that the defendant knew that Aikey would be in the victim's proximity and would share information with her, especially information that involved the defendant, the victim's ex-husband. Contrast Commonwealth v. Furst, 56 Mass. App. Ct. 283, 285-286 (2002) (evidence did not support conclusion that defendant intended that person she took into confidence to help kill her estranged husband would relay threats to him).
The nature and the contents of the communications themselves further indicated the defendant's intent that they reach the victim. In one of his first text messages to Aikey, the defendant wrote, "You're going to die by my hands and this is a text message so everyone knows that that's how you died. I'm not hiding anything." Similarly, the defendant made his intentions public on Facebook, posting a message that said, "Mike, I will murder you, nothing to hide here, when [M]ike Aikey turns up dead and murdered I did it." The jury could reasonably find that the defendant would have expected that this explicitly threatening message would be conveyed to Aikey and the victim by their mutual Facebook friends, as in fact it was. Most telling, shortly after Aikey received the first threatening message from the defendant, the victim contacted the defendant's girl friend, Anna Redden, who had accompanied him on the trip to Florida, to learn if they intended to return to Massachusetts. The defendant responded by texting Aikey, "Keep messaging [Redden], you're both going to get it." This message explicitly suggests that the defendant intended Aikey to communicate with the victim.
With respect to the no-contact order, the fact that Aikey initiated communications with the defendant does not excuse the defendant's subsequent, indirect contact with the victim. While unintentional or accidental contact with the protected party typically will not violate a no-contact order, see Commonwealth v. Shea, 467 Mass. 788, 794 (2014), permissible, unintended contact "cannot be used as an occasion to harass, threaten, or intimidate the protected party." Commonwealth v. Silva, 431 Mass. 194, 198 (2000). See Commonwealth v. Kendrick, 446 Mass. 72, 76 (2006) ("Happening on a protected person whom one did not, and could not reasonably, know to be present is not a violation, but the party subject to the order must end the encounter by leaving"); L.F. v. L.J., 71 Mass. App. Ct. 813, 821 (2008) (while "litigation exception" to c. 209A no-contact order permits limited contact, "the person against whom the order has been entered cannot, under the guise of negotiations, engage in tactics designed to harass, threaten, or embarrass the person who sought the order").
Viewed in the light most favorable to the Commonwealth, a rational trier of fact could have determined that after a single telephone call with Aikey, the defendant purposely and continuously tried to reestablish contact, and that the content of his communications far surpassed the permissible scope of incidental contact. Required to avoid direct or indirect contact with the victim, the defendant instead repeatedly threatened and harassed Aikey and, through him, the victim. This was intentional, impermissible contact, not just an accident or a mistake. See Shea, supra at 795.
2. Authenticity of the texts and Facebook posts. After a voir dire hearing at which Aikey and Redden testified, the trial judge found that the defendant's text messages and Facebook posts were admissible. The defendant contends that the electronic communications were erroneously admitted because they lacked sufficient authentication. We disagree.
"Authentication of a document is a condition precedent to its admissibility." Commonwealth v. Foster F., 86 Mass. App. Ct. 734, 737 (2014). To properly authenticate an item of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Mass. G. Evid. § 901(a) (2018). "Evidence may be authenticated by direct or circumstantial evidence, including its '[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics.' " Commonwealth v. Purdy, 459 Mass. 442, 447-448 (2011), quoting from Mass. G. Evid. § 901(b)(1), (4) (2011), and Fed. R. Evid. § 901(b)(1), (4) (2010).
"[T]he basic principles of authentication are the same" for electronic and paper communications. Purdy, supra at 450. Where the relevance and admissibility of electronic communications is contingent upon their being authored by the defendant, the trial judge must make a threshold determination of authorship by a preponderance of the evidence. See ibid.; Commonwealth v. Oppenheim, 86 Mass. App. Ct. 359, 366 (2014) ; Mass. G. Evid. § 901(b)(11) (2018). Evidence of the defendant's name on an electronic mail message or social networking account is not sufficient; the proponent must show additional "confirming circumstances" that allow a reasonable jury to conclude "by a preponderance of the evidence that the defendant authored the [communications]." Purdy, supra. See Commonwealth v. Gilman, 89 Mass. App. Ct. 752, 758-759 (2016). However, "[n]either expert testimony nor exclusive access is necessary to authenticate the source." Mass. G. Evid. § 901(b)(11) (2018).
The judge did not err or abuse her discretion in admitting the text messages and Facebook posts. The Commonwealth authenticated the text messages with ample direct evidence and confirming circumstances. Aikey originally received the defendant's telephone number in a direct interaction with the defendant and immediately saved it in his list of contacts. The victim corroborated that the telephone number from which the texts were received was the defendant's (her ex-husband). Aikey began receiving the text messages from the defendant's telephone number after calling that number and speaking with the defendant. The text messages continued "the familiar tone of the exchange" between the two. Oppenheim, supra at 368. In addition, the text messages were "replete with personal references," Gilman, supra at 759, further identifying the defendant as the author.
Moreover, both Redden and the victim testified that they heard the defendant and Aikey, respectively, having a heated argument on the telephone. Redden was alone with the defendant on their drive to Florida, and no one else had access to his telephone. The text messages also made references to the defendant being on his way to Florida, which Redden confirmed. See Commonwealth v. Amaral, 78 Mass. App. Ct. 671, 674 (2011) (confirming circumstances present where electronic mail messages indicated defendant "would be at a certain place at a certain time, and the defendant appeared at that place and time"); Foster F., 86 Mass. App. Ct. at 737 (confirming circumstances present where defendant's location matched where he said he was going to be).
While the Facebook posts present a closer question, as access to a Facebook account is not as limited as access to a cellular telephone, similar confirming circumstances existed to authenticate the posts as having been authored by the defendant.
As an initial matter, Aikey was competent to testify that he personally took "screenshots" of the Facebook posts and printed them out. See Gilman, supra at 759-760 ("best evidence" rule does not forbid use of duplicates of electronic records). The fact that Aikey received them from a third party goes to the weight of the evidence, not its admissibility. See Commonwealth v. Mahoney, 400 Mass. 524, 529-530 (1987) ; Purdy, supra at 451 & n.7.
The Facebook posts all included the defendant's name and photograph, and confirming circumstances provided additional evidence of his authorship. Some of the posts indicated his location in Florida, which the evidence at trial corroborated. One indicated his presence in South Carolina; Redden testified that she took the photograph used in this entry and that the defendant posted it on Facebook. Redden also explained that the defendant took a photograph of a hatchet and posted it on his Facebook page because they had hit a deer on their drive, it had wrecked the car, and "[h]e was mad at the deer. That Facebook message had nothing to do with his wife."[3] These confirming circumstances allowed the judge to conclude that it was more likely than not that the defendant had authored the Facebook posts.
Finally, there is no merit to the defendant's claims that the Facebook posts and text messages constituted inadmissible hearsay or violated his confrontation rights. Aikey was available for cross-examination. The statements attributed to the defendant were not offered for their truth-that the defendant actually would kill Aikey and would rape and kill the victim-but rather as "verbal acts." Purdy, supra at 452. Even if they were offered for their truth, they would be admissible as admissions of a party opponent. Gilman, supra at 757 n.6.
Judgments affirmed.

We refer to the ex-wife as the victim, although Aikey too was a victim with respect to some of the convictions.

We reject the defendant's claim, raised for the first time on appeal, that the danger of prejudice from the post about the hatchet outweighed its probative value. In light of Redden's explanation of the photograph, and compared with the language and tenor of the defendant's threatening Facebook posts and text messages, any error would not have created a substantial risk of a miscarriage of justice. Likewise, there is no substantial risk that the jury would have understood, let alone be prejudiced by, the defendant's unexplained comment, "I can't wait to move in with my dad."